### UNITED STATES of America, Plaintiff-Appellee,

v.

### Travis Leon WILSON, Orrin Shaid, Jr., Louis Levin, Jerald Aaron White, Jason N. Winthrop and David Levi White, Defendants-Appellants.

#### No. 73-1723.

United States Court of Appeals, Fifth Circuit.

Sept. 18, 1974.

Rehearing Denied Nov. 18, 1974.

5. *See* also the suggestion in *O'Shea* of possible relief under 18 U.S.C. § 242. 414 U.S. at 488, 94 S.Ct. at 669, 38 L.Ed.2d at 687-688.

Tomas G. Pollard, Jr., Tyler, Tex., (Court-appointed), for Travis Leon Wilson.

Thomas Roberson, Houston, Tex. (Court-appointed), for Jerald Aaron White.

T. D. Smith, William E. Heitkamp, Houston, Tex., for Orrin Shaid, Jr.

R. James George, Jr., Austin, Tex., for Louis Levin.

Herbert J. Coleman, Houston, Tex., for Jason N. Winthrop and David Levi White.

Roby Hadden, U. S. Atty., Tyler, Tex., Joseph C. Hawthorne, Asst. U. S. Atty., Beaumont, Tex., for the United States.

Before GOLDBERG, GODBOLD and MORGAN, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge.

The appellants were indicted in May, 1972, in a 60 count indictment for various acts involving the purchase and operation of the Chireno State Bank of Chireno, Texas, and the First State Bank of Grandview, Texas. All defendants were tried together in a trial which covered a period of approximately four weeks. The indictment charged violations of 18 U.S.C. §§ 2, 215, 371, 656, 1005 and 1014.

FACTS:

Orrin Shaid, Jr., in February of 1971, contacted Nathaniel Price, apparently for the purpose of getting Price to help him locate a bank that Shaid might purchase. Price contacted V. L. Evans, who subsequently located the Chireno State Bank, which was at that time for sale. Evans introduced Shaid to the owner of the Chireno State Bank, J. R. Lyon, Jr., and Lyon later designated John Hooper, an employee of his, to represent Lyon in

negotiations for the sale of the Chireno Bank to Shaid. At approximately the same time, Travis Leon Wilson was selected to be president of and operate the Chireno State Bank if the Shaid plan worked out.

Because Shaid found that it would be impossible for him to purchase the Chireno bank himself, it was suggested that he obtain some additional backers. The evidence indicates Louis Levin, a financial consultant, was asked if any of his customers would be interested in investing in a small bank of this nature. Four of Levin's customers did apparently buy Chireno State Bank stock and signed notes for that purpose. The group that eventually purchased the bank consisted of Orrin Shaid, Jr., Orrin Shaid, Sr., Travis Leon Wilson, S. Nathaniel Price, Louis Levin, David Levi White, Jerald Aaron White, Charles St. Clair Scott, and George Littlefield. Loans from the Franklin Bank in Houston, Texas, the Northeast Bank, and the Orange Bank were used to purchase Chireno State Bank's stock, which stock was then put up as security for the loans.

Jerald White, David White, and George Littlefield stated during the investigation prior to the grand jury indictment that one of the reasons they signed a note for the purchase of Chireno State Bank stock was to secure a more readily available line of credit for loans and financing. In other words, it appeared to be a policy of Shaid, Jr. to promise readily available loans to people who would join him in the purchase of the Chireno Bank. The evidence at trial demonstrated that each of Levin's customers who had invested in the Chireno State Bank did subsequently obtain a large unsecured loan which was never repaid. Starting March 5, 1971, when Travis Leon Wilson began taking over management of the Chireno State Bank, numerous unsecured loans were made, against bank policy, to members of the control group mentioned above. Financial statements of various members of the control group were on file at the bank, but were found to be false. During the period following purchase of control of this bank, there was fast and furious financial manipulation of the funds of the bank by various members of the Shaid group. In April of 1971, Orrin Shaid, Jr. began negotiating to purchase the First State Bank of Grandview, Texas. In order to accomplish this, further financial manipulations were necessary. After the First State Bank of Grandview was acquired, Travis Leon Wilson, who had assumed its management, began granting unsecured loans to members of the group. These loans included $31,500 to S. Nathaniel Price and a $30,778.50 unsecured loan to Orrin Shaid, Jr. The total of these loans, $123,781.20, was used to write off the notes and interest at the Chireno State Bank which were owed by members of the Shaid group. As a result of this complex set of financial dealings and other irregularities, the directors of the First State Bank of Grandview removed Travis Leon Wilson as director and disapproved the unsecured loans mentioned above. On June 9, 1971, a demand was made for payment of the notes, and when no payment was forthcoming the notes were charged off by the bank examiners on June 12, 1971. On June 14, 1971, various unsecured notes in the names of the defendants on the books of the Chireno State Bank were charged off.

It should be noted that on June 4, 1971, a demand was made of Shaid, Jr., Shaid, Sr., Littlefield, Levin, Scott, Jerald White, David White, Price, and Wilson for payment of the notes they had placed in the Franklin Bank of Houston, Texas, to finance the purchase of the Chireno State Bank. Upon failure of payment, the notes were charged off. The Board of Directors of the Chireno State Bank and the state and federal bank examiners then met on June 12, 1971, for the purpose of getting the Board to sign a closure statement closing down the Chireno State Bank. The statement provided that the bank was to be closed by 9:00 A.M., June 14, 1971,

unless $275,000 in cash could be put back in the bank to recapitalize it. Two hundred thousand dollars was raised by a group of 19 Chireno townspeople not associated with these financial dealings and was deposited in the bank. For that reason, the bank remained open and continued to do business as usual and is still doing business.

As a result of these complex and rapid fire financial maneuvers an investigation was instituted by federal and state authorities. In May of 1971, the 60 count indictment was returned against various defendants, including appellants. The appellants each received individual consideration by this court.

## ORRIN SHAID, JR.

■ Orrin Shaid, Jr. first argues that 18 U.S.C. § 656, which forbids the embezzlement, abstraction or willful misapplication of bank funds by one connected in any capacity with the federally insured bank is unconstitutional because of vagueness. We find there to be no basis to this argument.

■ Appellant argues that the statute is unconstitutionally vague because the term "willfully misapplied" contained in 18 U.S.C. § 656 has no commonly accepted technical meaning. It appears, however, that courts have defined this term as covering actions which are not covered by the technical terms "embezzlement" or "abstraction." Courts have held that the acts which are obviously improper and amount to the unjustified use of bank funds and which amount to more than mere bad judgment or maladministration constitute "willfulness." United States v. Heinze, 161 F. 425 (2 Cir. 1908), United States v. Fortunato, 402 F.2d 79 (2 Cir. 1968), cert. den. 394 U.S. 933, 89 S.Ct. 1205, 22 L.Ed.2d 463 (1969), Mulloney v. United States, 79 F.2d 566 (1 Cir. 1935), cert. den. 296 U.S. 658, 56 S.Ct. 383, 80 L.Ed. 468 (1935). In fact, courts have generally held that the gist of the offense of willful misapplication is the conversion of funds of a federally insured bank by one connected in some capacity with the bank either to his own use or to the use of a third person, with the intent to injure or defraud the bank. United States v. Steinman, 172 F. 913 (3 Cir. 1909), United States v. Morse, 161 F. 429 (2 Cir. 1908), aff'd. 174 F. 539 (2 Cir. 1909), cert. den. 215 U.S. 605, 30 S.Ct. 406, 54 L.Ed. 346 (1909). Furthermore, recent cases have held that reckless disregard of the interest of a bank is, for the purpose of "willful misapplication," the equivalent of intent to injure or defraud. Logsdon v. United States, 253 F.2d 12 (6 Cir. 1958), Giragosian v. United States, 349 F.2d 166 (1 Cir. 1965), *vacated and remanded on other grounds.* It should be remembered above all else that this statute was enacted to preserve the FDIC from loss and to preserve and protect the assets of banks having a federal relationship. Garrett v. United States, 396 F.2d 489 (5 Cir. 1968), cert. den. 393 U.S. 952, 89 S.Ct. 374, 21 L.Ed.2d 364, reh. den. 393 U.S. 1046, 89 S.Ct. 615, 21 L.Ed.2d 599 (1968).

■ Shaid, Jr. also contends that the failure of the trial court to grant his motion for severance deprived him of his Sixth Amendment right to confront adverse witnesses. Prior to the commencement of the evidence, Shaid, Jr. filed a motion for severance on the grounds that (1) the defendants were improperly joined because the offenses charged were not the same or of similar character and were not based upon the same act or transaction; and (2) in the event that separate trials were held the appellant would be able to call as witnesses many of the other defendants in the trial and such witnesses would be able to freely testify about events within their knowledge in aid of Shaid, Jr.'s defense. A thorough perusal of the record by this court, however, has convinced us that no evidence was presented in support of this motion and the lower court's overruling of the motion was entirely proper.

■■ To acquire severance in order to obtain codefendants' testimony it

must be shown that the testimony would be exculpatory. The movant must also make a clear showing of what the co-defendants would testify to. The court is not required to sever where the possibility of the co-defendants testifying is merely colorable and there is no showing that there is anything more than a gleam of possibility in the defendant's eye. Byrd v. Wainwright, 428 F.2d 1017 (5 Cir. 1970). Here, no such showing was made.

■ Shaid, Jr. also contends that the excised statements of his co-defendants which were introduced into evidence implicated him. He alleges that he was denied his Sixth Amendment right of effective assistance of counsel because he was not allowed to cross-examine the co-defendants concerning these statements because of the co-defendants' Fifth Amendment rights. He cites Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The facts in this case, however, do not meet the prohibitions set out in *Bruton.* The court below held extensive hearings out of the presence of the jury and heard all parties' objections to portions of each statement of a co-defendant which might incriminate another co-defendant. The court excluded those portions of each defendant's statement which tended to incriminate a co-defendant. No limiting instruction was requested by any party. Appellant points to only two instances where co-defendants' statements implicated him, the statement of Jerald White that he had paid $1,600 for obtaining a loan, and the statement of Jason Winthrop that he paid a fee for his loan. Both of these statements referred to by appellant were made outside of the presence of the jury, and both were excluded and not mentioned before the jury. Shaid, Jr. refers to no other statement by any co-defendant which was introduced and incriminated him and none can be found. Therefore, it is clear that the above mentioned statements were not introduced in violation of *Bruton, supra,* and the court did not commit error in this regard.

It is also contended by Shaid, Jr. that the trial court erred in failing to declare a mistrial upon the comments made by the Assistant United States Attorney during his closing argument. We find this contention to be without merit.

During his closing argument to the jury, one of the Assistant United States Attorneys, in explaining the manner of proving one's knowledge of an illegal act, commented that, ". . . there is no way to prove knowledge directly. We can't put the man on the stand and ask him does he have knowledge . . . ." Shaid, Jr., at that time, moved for a mistrial. The court ruled that the comment was merely a hypothetical argument. The Assistant United States Attorney then continued his argument and explained that:

> It is scientifically impossible to prove by direct evidence a person's knowledge and therefore we are left to prove it by indirection, and by indirection I mean this. In determining if the defendant had knowledge that these statements were false we should look at it in context of everything that Mr. Hawthorne has told you and the context of this overall scheme which finally culminated in the purchase of the Grandview Bank.

The trial court specifically stated in its instruction to the jury that, "[t]he law does not compel a defendant in a criminal action to take the witness stand and testify." Furthermore, Shaid, Jr.'s counsel, realizing that the comment by the Assistant United States Attorney was inadvertently made, requested and was granted a special charge to the jury concerning the remark.

■ The Fifth Circuit recently stated that the test in determining whether or not a statement is a comment on the failure of a defendant to testify is whether or not the statement was manifestly intended or was of such character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify. United States v. White, 444 F.2d 1274

(5 Cir. 1971), cert. den. 404 U.S. 949, 92 S.Ct. 300, 30 L.Ed.2d 266 (1971). In the situation with which this court is faced, it is clear that the statement was not manifestly intended nor was it of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify. Furthermore, the court below specifically charged the jury that no defendant is required to testify and also specifically charged the jury according to appellant's request concerning the inadvertent statement made by Mr. Lewis, the Assistant United States Attorney. Therefore, the court's failure to grant a mistrial on the basis of Lewis' statement was not error.

This court's review of the trial record and the evidence presented clearly demonstrates that Shaid, Jr.'s arguments that certain evidence entered over the objection of the appellant was used in violation of the Fourth and Fifth Amendments has no merit. *See,* Harris v. United States, 413 F.2d 316 (9 Cir. 1969); Galbraith v. United States, 387 F.2d 617 (10 Cir. 1968); Application of Cole v. Franklin National Bank, 342 F.2d 5 (2 Cir. 1965); and De Masters v. Arend, 313 F.2d 79, 85 (9 Cir. 1963).

## TRAVIS LEON WILSON:

 Appellant Wilson contends that the trial court erred in admitting his excised confession into evidence because the confession had exculpatory and explanatory statements deleted from it. He states that the following are the exculpatory and/or explanatory statements which were deleted:

(1) Orrin Shaid, Jr. arranged for the purchase of the Chireno State Bank;

(2) Orrin Shaid, Jr. held the appellant's fifteen shares of Chireno State Bank stock in trust and organized the control group;

(3) Orrin Shaid, Jr. was the majority stockholder of Chireno State Bank by virtue of the trust agreement that was in effect;

(4) The appellant believed Orrin Shaid, Jr. was for all practical purposes the controller of the bank;

(5) Orrin Shaid, Jr. would handle the borrowing of money from the bank by control group members;

(6) An explanatory statement of the source of the twenty-five thousand dollars for the purchase of Grandview bank was deleted;

(7) Orrin Shaid, Jr. organized the purchase of the First State Bank of Grandview;

(8) The appellant believed Orrin Shaid, Jr. and Orrin Shaid, Sr. had the net worth claimed by their financial statements;

(9) The names of Agnes A. Lewis, James E. Evans, David Benjamin, Walter Lewcum, Fred Earhard, III, George Pyle, and Charles Kennedy, participants in the purchase of the Grandview bank, were deleted from the statement;

(10) The fact that four notes in the names Orrin Shaid, Jr., Charles Kennedy, S. Nathan Price, and Fred Earhard, III were deleted from the part of the statement explaining the $123,000.00 of loans that were placed on the books of the Grandview bank.

Each of these matters, except for number eight, was brought out by other testimony and evidence and therefore the statement containing Wilson's confession would merely have been cumulative. As to number eight, we are unable to find any statement in Wilson's confession which indicates that he believed that Shaid, Jr. and Shaid, Sr. possessed the net worth claimed on their financial statements. Whatever the argument, the excised statements would have been merely cumulative, and apart from them the case against the appellant was so overwhelming that any possible error in deleting them was harmless beyond a reasonable doubt. Posey v. United States, 416 F.2d 545 (5 Cir. 1969), cert. den. 397 U.S. 946, 90 S.Ct. 964, 25 L.

Ed.2d 127, reh. den. 397 U.S. 1031, 90 S.Ct. 1267, 25 L.Ed.2d 544 (1969), Hoover v. Beto, 467 F.2d 516 (5 Cir. 1972), cert. den. 409 U.S. 1086, 93 S.Ct. 703, 34 L.Ed.2d 673 (1972), United States v. Davis, 418 F.2d 59 (9 Cir. 1969), Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1968).

Appellant Wilson's other contention on appeal is that the statement made by the Assistant United States Attorney concerning his failure to take the stand violated his Sixth Amendment rights, and for that reason a mistrial should have been granted. The same reasoning applied above to Shaid, Jr.'s argument applies here.

DAVID LEVI WHITE:

Appellant White first contends that severance should have been granted because his defenses and those of Travis Leon Wilson were in conflict. However, there does not appear to have been any showing of conflict between the defenses and White points to none in his brief. He simply alleges the conclusion that conflicting defenses existed. Before severance is required because of conflicting defenses, the defenses must be antagonistic to the extent that they approach being mutually exclusive. United States v. Kahn, 381 F.2d 824 (7 Cir. 1967), cert. den. 389 U.S. 1015, 88 S.Ct. 591, 19 L.Ed.2d 661, reh. den. 392 U.S. 948, 88 S.Ct. 2272, 20 L.Ed.2d 1413 (1967). With the record completely devoid of any evidence that the defenses of appellants White and Travis Leon Wilson were conflicting, the trial court did not err in failing to grant appellant White's motion for a severance on this ground.

Appellant White also claims that a severance should have been granted because he was deprived of the right to call his co-defendants in his behalf. No showing was made, however, that any of the co-defendants would in fact testify or that what they would testify to would be exculpatory as to White. See this court's discussion on Orrin Shaid, Jr.'s similar argument above.

White's contention as to the deprivation of his presumption of innocence, after examination of the trial record, appears on its face to be completely without merit.

Finally, White contends that the district court erred in failing to grant his motion for an instructed verdict of not guilty on all counts on which he was charged because of insufficiency of the evidence. This court has read the entire record of the proceedings below and finds that such an argument in this case is completely without basis in fact. Appellant White was charged and convicted in count two with furnishing a false financial statement to the Chireno State Bank in order to influence the action of the bank upon a loan. The evidence clearly showed that White and his brother obtained a $10,000 unsecured loan from the bank six days after it was purchased. Furthermore, the evidence showed that in all cases where a loan is unsecured, the FDIC requires a financial statement of the borrower to be on file in the bank. The evidence also showed that White's financial statement was found in the bank's business records. A member of the bank's Board of Directors testified that in seeking Board approval of White's loan and White's brother's loan, Wilson stated that he had the appellant's financial statement and that he, Wilson, encouraged the Board to approve the loan because the financial statement showed that White had "plenty of money." Therefore, the evidence was such that the jury could have reasonably concluded that the evidence excluded every reasonable hypothesis except that appellant White furnished his financial statement to the bank in order to influence its action on his loan.

White was also charged and convicted in count three with aiding and abetting in the misapplication of bank funds in connection with the granting of the loan. The jury could have reasonably concluded from the evidence that White knew that the loan he was granted was granted to him by Wilson only

because he assisted Shaid, Jr. in gaining control of the bank. Because the financial statement he submitted to the bank was materially false, it is only logical that he knew it would not be verified, but only used by Wilson to convince the Board of Directors that White was entitled to the loan. In this manner, then, he could have been said to have knowingly participated in a scheme of self-dealing in the assets of the bank and assisting Wilson in misapplication of bank funds by providing his financial statement and obtaining the loan.

In count 60, appellant was charged and convicted with nine other co-defendants of conspiring to violate 18 U.S.C. §§ 656, 1014 and 2. As has been stated, because of the similarity of methods of acqustion and close proximity of acquisitions of the Chireno State Bank and the First State Bank of Grandview, the jury could have reasonably concluded that the purchase of these banks constituted a single plan between Shaid, Jr., Shaid, Sr, and Wilson for bank acquisition, with the remaining co-defendants participating in the plan in varying degrees. That plan was obviously to acquire banks by recruiting investors with promises of loans from the bank after acquisition. Such dealings in the funds of the bank clearly constituted misapplication of the bank funds, and the agreement, coupled with overt acts of recruiting investors and granting loans, constituted a conspiracy to misapply the funds of the bank. The evidence disclosed that White participated in the purchase of the Chireno bank and that one of his purposes in so doing was that a line of credit or a source of financing would be available to him. Thus, there must have been a prior agreement that he would be able to borrow money from the Chireno bank in return for assisting in its purchase. When he agreed to participate in the purchase for this purpose and signed a note for the purchase in furtherance of the agreement, he joined the conspiracy. The facts speak for themselves. White was granted a large unsecured loan shortly after the bank was acquired.

It is acknowledged that there was no evidence introduced showing any further participation by White in either the Chireno bank or the Grandview bank acquisitions. However, the fact that his participation in the scheme was limited to assisting in the acquisition of the Chireno bank and obtaining a loan from the bank does not mean he cannot be convicted as a conspirator. It is not necessary that each co-conspirator know all other conspirators or that each was involved throughout the entire conspiracy. United States v. Green, 327 F.2d 715 (7 Cir. 1964), cert. den. 377 U.S. 944, 84 S. Ct. 1350, 12 L.Ed.2d 306 (1964). Likewise, it is not essential that each conspirator participate in all activities in furtherance of the conspiracy or have knowledge of them. McManaman v. United States, 327 F.2d 21 (10 Cir. 1964). One who participates in a criminal conspiracy is no less liable because his part may be minor and subordinate. Sabari v. United States, 333 F.2d 1019 (9 Cir. 1964). Therefore David White's participation was clearly sufficient to bring him within the conspiracy and to sustain his conviction.

The arguments of Jerald White are of such similarity to those of his brother that it would be repetitious to enumerate them here. This court's answer to Jerald White's allegations as to severance and as to the sufficiency of the evidence and as to comments made by the Assistant United States Attorney and as to evidence of acts concerning the purchase of the First State Bank of Grandview and as to putting into evidence the excised statements of the appellant is that they are without merit for the reasons stated above.

LOUIS LEVIN:

Appellant Levin was charged and convicted on counts three and six, with aiding and abetting the misapplication of the Chireno bank's funds in connection with loans which were made to co-defendants Jerald White, David

White, and Charles Scott. Levin contends that the trial court erred in failing to grant his motion for judgment of acquittal based on insufficiency of the evidence.

The government's theory at trial on the misapplication of bank funds in counts three and six was that Levin was asked by Shaid, Jr. to assist him in recruiting individuals to syndicate the purchase of the Chireno bank. At that time, Levin was a "financial consultant;" his business consisted primarily of obtaining loans for his customers. Levin in turn contacted the Whites and Scott and recruited them into the syndication by promising them large unsecured loands from the Chireno bank if they participated in the purchase by signing notes at the Franklin bank. Also, they were to turn over the control of their stock to Shaid, Jr. It was the government's contention on appeal, as well as at trial, that the loans from the Chireno bank to the Whites and Scott, based upon such an agreement, constituted reckless misuse of Chireno bank funds, and that Levin's role in this scheme made him an aider and abetter in the misapplication.

As indicated previously, when Shaid, Jr. found that he did not have sufficient capital to buy the Chireno bank on his own, he attempted to obtain additional backers. It appears that Louis Levin was asked if any of his customers would be interested in purchasing into the Chireno bank and, in fact, four entered the group. Levin was associated with both of the Whites and Scott. The Whites told special agent Hopkins, who was investigating the bank matter, that they had participated in the purchase of the Chireno bank because it would open up a source of financing and that money would be readily available to them for borrowing purposes. It was also in evidence that Louis Levin, immediately following the purchase of the Chireno bank, was associated with Shaid, Jr. in recruiting investors for the First State Bank of Grandview. In fact, Levin

promised two investors, Lewis and Evans, that if they signed notes for the purchase of the Grandview stock and turned over control of the stock to Shaid, Jr., they would receive preferential loans at the Grandview bank. It was also shown that Shaid, Jr. used this same tactic in attempting to recruit J. W. Gunter into the purchase of the Grandview bank. Six days after the purchase of the Chireno bank, the Whites obtained a $10,000 unsecured loan, and within three weeks of the purchase, Scott obtained a $25,000 unsecured loan. Both loans were made by Wilson, in direct contravention of explicit instructions from John Hooper, representative of the sellers of the Chireno bank. Other syndicate members also obtained loans from the Chireno State Bank in a similar manner.

The jury could have reasonably found that the evidence and all reasonable inferences that could be drawn therefrom excluded every reasonable hypothesis except that Levin participated with Shaid, Jr. and Wilson in their acquisition plans by recruiting investors into both the Chireno bank deal and the Grandview bank deal by promising investors loans from these banks. It is obvious that Levin's motive in so doing was to further his financial consulting business by obtaining loans for his customers. Loans granted on such a basis clearly constitute misapplication of bank funds, and Levin's participation in the scheme rendered him liable as an aider and abetter in the misapplication.

▆▆ Levin was also convicted in count 38 of aiding and abetting in the misapplication of Chireno State Bank funds in connection with the 14 promissory notes totaling $255,000 that were placed on the books of the Chireno bank to purchase the Grandview bank.

The evidence also indicates that during the period immediately prior to the attempted purchase of the Grandview bank, Agnew Lewis and James Evans associated with Levin. They were re-

quired to furnish Levin financial statements and, subsequent to that, were taken by Levin to Shaid, Jr.'s office in Houston, where Levin explained that in order for them to obtain the loans they desired, they would have to sign a note for the purchase of a bank, and if Shaid, Jr. got control of the bank, they would be guaranteed loans from the bank. They both signed such notes. Approximately one week later, Levin informed Evans to forget about his loan because the deal had fallen through. However, Shaid, Jr. did, in fact, purchase the Grandview bank, and shortly thereafter Wilson placed over $123,000 worth of loans in the Grandview bank and used the proceeds to pay off most of the notes used for the purchase, including the notes of Lewis and Evans. Levin also signed a note which was one of the notes used for the purchase of the Grandview bank and one-half of this note was paid off by a portion of the $123,000.

This court cannot say that the jury could not have reasonably concluded that the evidence excluded every reasonable hypothesis except that Levin recruited Lewis and Evans into the purchase of the Grandview bank with the promise of loans from that bank. Since Levin was also one of the 14 investors who signed notes payable to the Chireno bank for the same amount as Lewis' and Evans' note, since his note was used to finance his portion of the purchase of the Grandview bank, and since Levin had recruited investors for the Chireno State Bank in the same manner as investors were recruited for the Grandview bank, it is reasonable to infer, as it appears the jury did, that he knew the notes that he, Evans, and Lewis signed would be placed on the books of the Chireno bank. It could also reasonably have been concluded that he knew the proceeds would be used to finance the purchase of the Grandview bank.

This court cannot say that the jury or the trial judge was incorrect in finding these to be the facts.

Levin was also charged and convicted in count 60 with conspiracy to violate 18 U.S.C. §§ 656, 1014 and 2. It was shown by direct evidence at trial that Levin recruited investors for the Grandview bank by promising loans from the bank, and it was further shown by circumstantial evidence that he recruited investors in the Chireno bank by the same method. After considering the entire record and all the evidence presented, we cannot say the finding below that Lewis Levin assisted Orrin Shaid, Jr. and Travis Leon Wilson in recruiting investors for the two bank deals was erroneous, and for that reason we must sustain the finding of the lower court.

Levin also contends that the trial court erred in failing to grant a severance because excised statements of his co-defendants were introduced into evidence and he was prevented from cross-examining the co-defendants as to their statements and was limited in his cross-examination of the F.B.I. agents regarding the contents of those statements. Levin claims that he was thus prevented from eliciting exculpatory statements in these two ways.

Before severance is required in order to obtain a co-defendant's testimony, it must be shown that the co-defendant would in fact testify, what his testimony would be, and that the testimony would be favorable. Here, there was no such showing. Levin states that he was prevented from making such a showing by the trial court's order from the outset of the trial that no co-defendants were to be called to the stand. It is clear, however, that the court's instructions applied to conduct in the presence of the jury. There is no showing that had Levin found a co-defendant who would have testified if a severance were granted the trial court would not have allowed him to show this fact by calling the co-defendant outside the presence of the jury in support of his motion for severance. In fact, the trial court did allow counsel for appellants Jerald White and Jason Winthrop to state into the record

outside the presence of the jury the substance of their clients' testimony in support of their motions for severance.

■ Levin also contends that he should have been allowed to cross-examine the F.B.I. agents who took the statements about matters contained in those statements which exculpated him and, had a severance been granted, no reason would have existed not to allow him to do so. Levin, however, points to no portion of any excised statement which would have exculpated him and none can be found. It has been held that before severance is required because of the introduction of excised statements, there must be ". . . concrete examples where any exculpatory or explanatory statements had been deleted." United States v. Kershner, 432 F.2d 1066, 1072 (5 Cir. 1970). There being no showing of any exculpatory or explanatory statements which were excised, the trial court committed no error.

■ Since there was no showing that any co-defendants would give exculpatory testimony had there been a severance and, furthermore, no showing of any statements exculpating Levin which were deleted from any statement introduced into evidence, the trial court did not err in failing to grant the appellant's motion for severance.

The same analysis as was applied above disposes of Levin's contentions as to the comments made by the Assistant United States Attorney in his closing argument.

## JASON N. WINTHROP:

Winthrop was convicted in count 25 of furnishing a false financial statement to the Chireno bank in order to influence the bank in granting him a $25,000 loan, and in count 26 with aiding and abetting in the misapplication of the funds of the Chireno bank in connection with the granting of this loan. Winthrop was also charged and convicted in count 28 with willfully over-valuing accounts receivable which were reportedly placed as security for the loan made to him. Also, in count 33, Winthrop was convicted of furnishing a false financial statement in connection with a loan of $16,470.58, which was made for the purpose of purchasing the Grandview bank. Finally, Winthrop was convicted of conspiracy to violate 18 U.S.C. §§ 2, 656 and 1014.

■ Winthrop's main allegation on appeal is that the trial court erred in failing to grant his motion for a judgment of acquittal. This court does not find there to be a difference between Winthrop and the other defendants. Winthrop was not involved in the purchase of the Chireno bank; however, the evidence viewed collectively in the light most favorable to the government was sufficient for the jury to have found that he did enter a scheme of bank acquisitions on or about the time he obtained his $25,000 loan from the Chireno bank. That loan, in addition to being such a large amount, was obtained without adequate security and after submission of a false financial statement. Winthrop failed to repay the loan, and he also executed a note for the purchase of the Grandview bank. The evidence speaks for itself. It has been held that a person may be convicted as a conspirator regardless of the point in time at which he enters the conspiracy. Roberts v. United States, 416 F.2d 1216 (5 Cir. 1969). Such a person may join a conspiracy already formed and in existence and be bound by all that has gone on before in the conspiracy, even if it is unknown to him, United States v. Knight, 416 F.2d 1181 (9 Cir. 1969); and, when the existence of a conspiracy is shown, slight evidence may be sufficient to connect the accused with the conspiracy, Lopez v. United States, 414 F.2d 909 (5 Cir. 1969). This court finds that the evidence established a pattern of conduct on the part of Winthrop which was sufficient to enable the jury to reasonably conclude that he entered the scheme at the time he obtained the $25,000 loan

and, therefore, his conviction should be upheld.

This court finds that the facts as found to be true by the jury, and the law as found to be applicable by the trial court, must stand. These convictions, in all respects, must be

Affirmed.