**Kenneth Albert BROCK,**
**Petitioner-Appellant,**

v.

**O.L. McCOTTER, Director of the Texas**
**Department of Corrections,**
**Respondent-Appellee.**

No. 85–2436.

United States Court of Appeals,
Fifth Circuit.

Feb. 5, 1986.

Will Gray, Carolyn Garcia, Houston, Tex., for petitioner-appellant.

Jim Mattox, Atty. Gen., Robert S. Walt, Asst. Atty. Gen., Austin, Tex., for respondent-appellee.

Before REAVLEY, TATE and HILL, Circuit Judges.

ROBERT MADDEN HILL, Circuit Judge:

Petitioner, Kenneth Albert Brock, appeals from the federal district court's judgment dismissing his application for habeas corpus relief. Having carefully reviewed the state and federal records, we conclude that the judgment of the district court should be affirmed.

## I.

On the afternoon of May 21, 1974, Vivian Hargrove and her husband, Joe Berry Hargrove, stopped in a Seven-Eleven convenience store and saw the store manager, Michael Sedita, and a second man standing behind the open cash register. The second man, later identified as Kenneth Albert Brock, held a pistol, and ordered the Hargroves to lie down on the floor. Brock then left the store, taking Sedita with him. After the two men left the store, the Hargroves saw a police car pull into the parking lot and frantically pointed in the men's direction. Sergeant Hogg radioed for backup units and the two men disappeared down an alley. When Hogg pursued, Brock shielded himself with Sedita and placed a gun at Sedita's chest.

Other officers arrived on the scene and blocked off the alley. Brock threatened to shoot Sedita if the officers did not back off. Two officers, imploring Brock not to harm Sedita, dropped their guns to their sides and backed away to allow Brock to pass them. Brock then encountered three more officers at which point Sedita yelled to an officer he knew, "Jack, don't come any closer, the guy is sick or crazy." After the police retreated, Brock shot Sedita in the chest and ran into a nearby ditch and forest. Sedita died within minutes from massive hemorrhaging of the aorta.

While staked out near the woods, Officer Lilly observed Brock come out between two houses. Brock approached Lilly and stated "I'm the one who did it. I shot the store owner." Brock was arrested and taken to the police station where he was found to be carrying over $125 cash in his pockets and boots.

Brock was convicted of capital murder by a Texas jury.[1] During the sentencing phase, the jury answered three special issues set forth in Tex.Crim.Proc.Code Ann. art. 37.071 (Vernon 1981), finding (1) that the conduct of the defendant that caused the death of the deceased was committed

---

1. Tex.Penal Code Ann. art. 19.03(a)(2) (Vernon 1974) provides that a person commits capital murder if he intentionally and knowingly commits a murder in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated rape, or arson.

deliberately and with the reasonable expectation that the death of the deceased or another would result; (2) that there was a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and (3) that the conduct of the defendant in killing the deceased was unreasonable in response to provocation by the deceased. As required by article 37.071 when the jury answers each of the three special issues affirmatively, the court sentenced Brock to death.

Brock petitions for habeas relief on four grounds. First, he claims that a prospective juror was excluded in violation of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). Second, he argues that the trial court violated his sixth, eighth, and fourteenth amendment rights by withholding from the jury's consideration the mitigating circumstance of his youth and by allowing the prosecutor, during jury selection, to commit six jurors to disregard his youth in mitigation of his sentence. Third, the prosecutor allegedly violated Brock's fifth and fourteenth amendment right against self-incrimination by commenting during his jury argument

on Brock's failure to testify. Last, Brock maintains that his sixth and fourteenth amendment right to effective assistance of counsel was denied.

## II.

### A.

■ Although the trial court did not articulate its basis for disqualifying prospective juror Virgie Shockley, we discern its implicit rationale to be that Shockley's professed inability to assess the death penalty, regardless of the facts, justified her disqualification under Tex.Penal Code Ann. art. 12.31(b) (Vernon 1974).[2]

In response to the court's questioning, Shockley stated that upon a proper show of evidence she would be able to find the defendant guilty though the punishment would be life imprisonment or death. The judge then explained to Shockley that in the sentencing phase the jury would be asked three questions and related those questions to her. He also explained that if the jury gave an affirmative answer to each of these questions, the death sentence would be mandatory. An exchange then took place between the judge and Shockley, based upon which Shockley was disqualified as a prospective juror.[3]

2. Article 12.31(b) provides:
   Prospective jurors shall be informed that a sentence of life imprisonment or death is mandatory on conviction of a capital felony. A prospective juror shall be disqualified from serving as a juror unless he states under oath that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact.

3. The exchange was as follows:
   Q. ... Now, do you have such a fixed opinion against the imposition of death as a punishment that you would not under any circumstances, irrespective of the evidence, be able to answer such questions in the affirmative even though you were satisfied beyond a reasonable doubt that such answer was proper as indicated by the evidence, knowing that such answer would result in the imposition of the death penalty?
   A. I just can't say. I have to give you an answer, I'm sure. I believe my doubts about capital punishment are so strong, I would have a hard time making my decision.

Q. Well, let me ask you this. Do you feel that your thoughts or opinions about that matter are so strong that you would automatically exclude considering answering those questions in a manner which would necessitate the imposition of death as a punishment in every case irrespective of the evidence in the case?
   A. No sir.
   Q. You do not feel that your opinion is of that nature, that you would be able to answer such questions? Is that what you are saying?
   A. I believe if it is the Law, we have to uphold the Law and approach that way.
   Q. Well, then you are telling me now that you feel that although you personally have opposition to the matter, you feel you could put aside your personal opinion about the matter and apply the Law if you honestly found that the evidence satisfied you beyond a reasonable doubt that the issues presented to you should be answered in a manner that would impose death as a punishment, is that right? Is that what you are saying?
   A. Yes sir.

Q. All right. You see, you are not necessarily bound to agree with the Law, but as a Juror, once you take an oath as a Juror, your oath binds you to return a verdict in accordance with the evidence and law, and you have to follow the law as it is given to you in the Court's charge, you understand that?

A. Yes sir.

Q. And you say you could put aside your personal opposition to it and apply the law and render a verdict that would impose death as a punishment in a proper case if you were satisfied beyond a reasonable doubt from the evidence?

A. Well, I understand it. I have no alternative, do I?

Q. Oh, you have an alternative to disagree with the law and you have an alternative—but if you take an oath as a juror to follow the law, why, then, of course, you would have to abide by your oath, and you don't have to be a juror, you don't have to agree with the law. That's what we are trying to find out now, whether you agree or disagree with the law. You see, an individual juror doesn't have the right to make the law themselves. The law is made by the Legislature and is put in the Code Book by our representatives, you understand that?

A. Yes sir.

Q. And as a juror you have to follow that law. You don't have to agree with it, but these lawyers here and the Court have to know, have a right to know whether you would follow it if you were a Juror.

A. You are telling me I wouldn't have to follow it?

Q. If you were a Juror you would.

A. If I were a Juror?

Q. But at this time I simply need to know what your position is on it, whether you would follow it, or whether your own personal opinions would preclude you from following it.

A. I don't believe I could follow it in that case.

Q. Well, then let me just ask you do you feel that you, in all cases, where you were a Juror in a case, and the death penalty was one of the possible authorized penalties by Law, would you automatically refuse or automatically not consider or be unable to consider imposing death as the punishment irrespective of the evidence?

A. Yes sir.

Q. And you just never would return a verdict in any case that would impose death as a punishment?

A. No sir.

Q. Because of your own personal opinions?

A. Yes sir.

Q. And if you were a Juror and were called on in the matter of the determination of guilt or innocence, which the jury would first be called upon to pass on that question and that question only, and if the charge authorized you to return a verdict finding a person guilty or not guilty of the offense of capital murder—the charge would instruct you that if you find you are satisfied from the evidence beyond a reasonable doubt the defendant is guilty of the offense of capital murder, then you will find him guilty of such offense, and if you are not satisfied from the evidence beyond a reasonable doubt the defendant is guilty of such offense, you will acquit him of the offense of capital murder, and you will next consider then whether he's guilty or not guilty of a less serious offense which does not carry as one of the possible punishments the death penalty, would this influence you in making a determination of whether a person was guilty?

A. Yes sir, I should think so.

Q. Would you, by reason of your opinion about such matter, automatically exclude considering finding a person guilty of capital murder knowing that one of the penalties could be the imposition of the death penalty?

A. Yes sir. May I ask you something else?

Q. Yes, ma'am, you certainly may.

A. What I'm telling you now, am I bound by this in case in the Jury Room I'm convinced otherwise?

Q. Well, you have to advise the Court at this time exactly what your position is.

A. At this time, but I can't be swayed later, is that not right?

Q. Well, you couldn't take an oath that you are going to do one thing and then do another. You would in violation of your own oath. A person who would do that matter might even be subject to being held in contempt of Court for telling under oath one thing and then doing another.

A. That's the way I feel as of right now, but once one hears the evidence and hears other people arguing, you might be convinced and you might change your mind.

Q. Well, you—we are not asking you about any particular situation. You understand my question is if you have such an opinion about such matter that you just do not feel that there could be facts and circumstances surrounding the commission of the offense of capital murder or the person that committed it that to your mind could warrant, justify and render it proper to return a verdict that would impose death for a person found guilty of such offense?

A. Put that way, I would say my convictions would keep me from doing it.

Q. Your convictions would preclude you from doing that?

A. Yes sir.

Q. And you would in every case return a verdict—you may assess some other punishment but not the imposition of death?

A. Yes sir.

Q. And you would do that automatically irrespective of what the evidence of the case might be?

Brock appears to argue that because Shockley initially stated that she would faithfully apply Texas law during the sentencing phase, the judge improperly relied on her subsequent testimony in reaching his conclusion that Shockley would be unable to answer impartially the three special issues put to the jury during the sentencing phase. We disagree. *Witherspoon* suggested in dicta that a capital sentence would be upheld if a disqualified juror expressed in "unmistakably clear" terms an inability to assess the death penalty under any circumstances. The Supreme Court has since modified its requirement of unmistakable clarity in *Wainwright v. Witt*, —— U.S. ——, ——, 105 S.Ct. 844, 856, 83 L.Ed.2d 841, 856 (1985), which requires this court to accord a presumption of correctness to a state court's findings of fact regarding a venireman's ability to abide by state law in performing his role as a juror. Under the current jurisprudence we must accept as correct any such finding of fact if it is supported by the evidence when viewed as a whole. *Wainwright v. Witt*, —— U.S. at ——, 105 S.Ct. at 856, 83 L.Ed.2d at 856; *see also Williams v. Maggio*, 679 F.2d 381, 385 (5th Cir.1982) (disqualified juror's testimony need not be consistent), *cert. denied*, 463 U.S. 1214, 103 S.Ct. 3553, 77 L.Ed.2d 1399 (1983).

We find that Shockley's clear, unambiguous statement that, at the time of the voir dire, her objections to the death penalty were so powerful that she would automatically assess a penalty other than death to be conclusive. The judge's questioning, neither coercive nor overbearing, casts no doubt upon the voluntariness of Shockley's retraction. Moreover, Shockley's speculation that perhaps she might, after hearing the evidence, change her mind about her ability to assess the death penalty does not bear upon her present ability to follow Texas law. When the judge explained to Shockley that he was not asking her about "any particular situation" and reiterated his question whether she had "such an

opinion about the [death penalty] that [she] just [did] not feel that there could be facts and circumstances surrounding the commission of the offense of capital murder or the person that committed it that to [her] mind could warrant [the death penalty]," Shockley replied, "Put that way, I would say my convictions would keep me from doing it." This evidence amply supports an implicit finding that Shockley would automatically impose a life sentence and not death, in derogation of her duties under state law.

Having determined that the state trial judge's implicit findings are supported by the evidence we now turn to Brock's argument that Shockley's disqualification was in violation of the legal standards set forth in *Adams*. *Adams* forbad the imposition of the death penalty by a Texas jury, purged of individuals who stated they would be "affected" by knowledge that the death penalty was a possible punishment. *Adams* clearly contemplates, however, that states may legitimately exclude jurors who would be unable to assess the death penalty under any circumstances. "The State may insist that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court." *Adams*, 448 U.S. at 45, 100 S.Ct. at 2526.

> If the juror is to obey his oath and follow the law of Texas, he must be willing not only to accept that in certain circumstances death is an acceptable penalty but also to answer the statutory questions without conscious distortion or bias. The State does not violate the *Witherspoon* doctrine when it excludes prospective jurors who are unable or unwilling to address the penalty questions with this degree of impartiality.

*Id.* at 46, 100 S.Ct. at 2527. We conclude that the facts of the case before us fall outside the limited reach of *Adams* and that Shockley's disqualification was an appropriate exercise of state power.[4]

A. Yes sir.

4. Brock does not assert on appeal that the exclusion of Shockley deprived him of a cross-sectional and impartial jury during the guilt phase

## B.

Brock's second claim is that, while article 37.071 does not preclude the admission of any relevant mitigating evidence, the special issues are framed in such a way that the jury is unable to consider such evidence in mitigation of a defendant's sentence. Brock alleges that this, combined with the fact that the prosecutor committed six jurors to disregard his youth as a mitigating factor, worked a deprivation of his constitutional rights.

The district court did not address Brock's claim regarding the deficiency of Texas' sentencing procedures. With regard to his claim of prosecutorial misconduct, the court stated that the prosecutor's questions could not be reasonably construed as committing the jurors to disregard Brock's age in considering relevant mitigating factors. According to the court the prosecutor simply elicited promises to consider all the evidence and to not allow the age factor, in and of itself, to foreclose the return of a guilty verdict.

We believe that the district court's characterization of the prosecutor's questioning applies to all the jurors except juror Kelly, whose conversation with the prosecutor was as follows:

> Prosecutor: Let me ask you one quick thing here. You know that the death penalty is a possibility in this case, and you are to only consider the evidence in the case in reaching that decision. One thing that will come out in this case is that the Defendant in this case, Mr. Brock, sitting over there is twenty-six years of age. Would that in any way affect your deliberations or make you hesitate in returning a verdict or a punishment that you thought was proper, not based upon his age but what you thought the evidence called for? Could you still do that in spite of his age, or would his age affect you in your deliberations in this case?
>
> Kelly: Age would not affect me.

In this instance, juror Kelly was not asked whether he would consider Brock's age to the exclusion of all other evidence but, rather, whether Brock's age would "affect" him in his deliberations. Clearly, if there is a right not to be sentenced to death by a jury unable to accord significance to the fact that defendant was twenty-five when he committed murder and twenty-six when he stood trial, the prosecutor's conduct was improper.

We find that article 37.071, even if it did withhold Brock's age from the jury's consideration of mitigating factors, did not violate Brock's constitutional rights,[5] and, therefore, that there was no prosecutorial misconduct.[6]

---

of his trial. Though this is not an issue in this appeal, we note that the Fifth Circuit rejects this claim as a basis for habeas relief. *Rault v. Louisiana,* 772 F.2d 117, 133 (5th Cir.1985); *Berry v. King,* 765 F.2d 451, 455 (5th Cir.1985); *Mattheson v. King,* 751 F.2d 1432, 1442 (5th Cir.1985); *Knighton v. Maggio,* 740 F.2d 1344, 1350 (5th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 306, 83 L.Ed.2d 241 (1984); *cf. Grigsby v. Mabry,* 758 F.2d 226 (8th Cir.1985), *cert. granted sub nom Lockhart v. McCree,* —— U.S. ——, 106 S.Ct. 59, 88 L.Ed.2d 48 (1985).

**5.** In *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), a plurality opinion predating *Lockett,* article 37.071 withstood a challenge to its facial validity. To the extent that the statute's application is arguably inconsistent with developing Supreme Court case law, however, we are free to pass judgment upon its constitutionality.

**6.** The respondent-appellee argues that because Brock failed to object at trial to the prosecutor's questioning, he waived his right to appeal therefrom and that, consequently, our review is precluded under the procedural default doctrine of *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Brock's claim relating to the prosecutor's questioning of juror Kelly was not raised on direct appeal to the Texas state courts. It was first raised there in 1982 in a petition for writ of habeas corpus. Because the state trial court order disposing of this petition has not been included in the record we cannot determine whether or not the state court relied on independent state grounds in adjudicating Brock's claim. Absent such reliance by the state court, the federal question is properly before us. *Wainwright v. Witt,* —— U.S. at ——, 105 S.Ct. at 856, 83 L.Ed.2d at 856 note 11; *see also Ulster County Court v. Allen,* 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).

Fortunately, we need not reach this issue. Because Brock's allegations of prosecutorial misconduct are linked to his claim that the jury was not permitted, within the framework of the

■ In *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (plurality opinion), the Supreme Court held that assessing the death penalty without according significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense is a violation of the eighth amendment. By way of clarification, the Court in *Lockett v. Ohio*, 438 U.S. 586 at 604, 98 S.Ct. 2954 at 2964, 57 L.Ed.2d 973 explained that it deemed "relevant" "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."[7] The Court cautioned, however, that its opinion did not limit the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense. 438 U.S. at 604 n. 12, 98 S.Ct. at 2965 n. 12. We believe that where no reasonable person would view a particular fact as mitigating it may properly be excluded as irrelevant. Brock was twenty-five when he murdered Sedita, old enough to have committed burglary as an adult and to have served out his entire sentence, and, as one of the jurors pointed out at voir dire, old enough to know what he was doing.[8] *Cf. Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (defendant was sixteen years old).

The Supreme Court has given its implicit approval to that aspect of the Texas sentencing scheme which limits the jury's discretion in assessing punishment. *See Adams v. Texas*, 448 U.S. at 45–47, 100 S.Ct. at 2526–27. To require Texas courts to consider as mitigating, evidence which

bears neither on the defendant's culpability nor on society's deterrent objectives is, we think, unwarranted. We discern the tragedy of taking life from a young, healthy, vigorous person. We do not believe, however, that the Constitution requires that mercy be dispensed on that basis.[9]

We therefore affirm the district court's disposition of Brock's second claim.

## C.

■ Brock's third ground for relief is that the prosecutor violated his constitutional right against self-incrimination by commenting during his jury argument on Brock's failure to testify. The prosecutor's argument was as follows:

> Remember what Mr. Burk [defense counsel] said to you back when we were picking the jury? Do you remember this? He said and he asked do you believe in rehabilitation. Yes, you all did, and we all do, certainly. He said do you believe any man can be rehabilitated. He asked you that and you agreed with it and said that if the man wants to, if he would take that first step, if he wants to, if he wants to be rehabilitated. Kenneth Brock has yet to take that step in the Courtroom, and I think the twelve of you know exactly what I mean and I want you to remember that when you go out there—

At that point, Brock's counsel objected that the prosecutor was making a direct comment and inference that Brock had not testified and moved for a mistrial. The objection was overruled and the motion was denied. The prosecutor then continued:

---

special issues set forth in article 37.071, to consider his youth, and because we decide this issue adversely to Brock, we need not base our findings relating to prosecutorial misconduct on Brock's failure to make a contemporaneous objection.

7. The Court expressed no opinion as to whether this rule applied to special cases as when a prisoner serving a life sentence escapes and commits murder.

8. We omit from the text the customary references to the length of time during which Brock, at age 25, had been subject to the privileges and duties of adulthood: self-support, imbibing, voting, and military service, to name a few.

9. This opinion does not pertain to the relevance of information relating to a defendant's emotional development. We have been asked only to consider the importance of Brock's chronological age.

Just remember that. The man has to want to. He has to want to be rehabilitated....

We begin by observing that the prosecutor's choice of words "in the Courtroom" was deplorable. After giving painstaking attention to the parties' opening and closing statements, however, we conclude that the record does not support a finding either that the prosecutor intended to comment on Brock's failure to testify or that a jury would naturally and necessarily interpret the prosecutor's remarks in this light. Without such a finding, Brock's claim must fail. *United States v. Sorzano,* 602 F.2d 1201, 1202 (5th Cir.1979), *cert. denied,* 444 U.S. 1018, 100 S.Ct. 672, 62 L.Ed.2d 648 (1980); *United States v. Wilson,* 500 F.2d 715, 721 (5th Cir.1974), *cert. denied,* 420 U.S. 977, 95 S.Ct. 1403, 43 L.Ed.2d 658 (1975).

To determine the manifest intent and the natural and necessary effect, the statements must be examined in the context within which they were made. *United States v. Garcia,* 655 F.2d 59, 64 (5th Cir. 1981); *United States v. Bright,* 630 F.2d 804, 826 (5th Cir.1980). We believe that the district court correctly set forth the context in which the above statement was made:

> Petitioner's counsel first argued at the punishment phase that the rich never get the electric chair but rather that "some guy that has been beaten down, poor and oppressed" is always the recipient of the death penalty. Counsel then made a number of references to support the proposition that Petitioner fell in the lat-

ter category. He further argued that Petitioner has been stripped of all his dignity and urged the jury to assess life imprisonment, suggesting that Petitioner was not a continuing threat to society. During the voir dire phase of the trial, Petitioner's counsel had inquired about rehabilitation, as noted by the prosecutor in the statements at issue. Petitioner called four witnesses during the punishment stage of the trial, but their testimony failed to touch upon any efforts toward rehabilitation. The jury argument for Petitioner described above was then made. It is within this context that we must make the *Sorzano* determination.

> The gist of the prosecutor's challenged statements, when viewed in their proper context, is simply (1) that Petitioner's counsel had discussed rehabilitation during voir dire; (2) that the witnesses then called by Petitioner did not indicate that Petitioner could be rehabilitated or even that he desired to be rehabilitated; and (3) that instead, Petitioner tried to blame his situation on his status as a "beaten down ... oppressed" individual.[10]

*Brock v. Procunier,* No. H–82–3064, at 9–10 (S.D.Tex. June 17, 1985) (footnote added).

We believe that Brock squarely raised the issue of his rehabilitation at trial and that the prosecutor was justified in alerting the jury's attention to the fact that the evidence in support of this proposition was scant. We reiterate that the prosecutor's formulation of his argument is not worthy of emulation. Viewing the record as a whole, however, we conclude that the pros-

---

**10.** To this we add from our examination of the record that Brock's counsel stated in his closing argument during the punishment phase (delivered before the prosecutor's argument because the prosecutor waived his right to go first) that Brock "talked to Him and he knows in his heart that he did wrong.... I can tell you this, that if God could [let him relive the thirty minutes preceding the murder], I can tell you the last thirty minutes of his time before he went in that Seven-Eleven, he would not have gone anywhere near it." Brock's counsel also urged the jury in closing argument to interpret Brock's having successfully served out his probation for

burglary as evidence of his capacity for rehabilitation.

Following the remark which is at issue in this case, the prosecutor argued "You know, Mr. Burk and the Defendant has the subpoena power that the state has, and they can bring any witness they desire, anyone that they want to in this Courtroom—." "[B]ut ask yourself who you heard come in and testify about the Defendant. Relatives and one friend. Did you hear a teacher? Did you hear a minister? Did you hear any citizen out here in society that he had worked for, an employer? If they were there, they could have been brought in."

ecutor's comments were intended to alert the jury to Brock's dearth of evidence, not to his failure to take the stand. We affirm the district court on this issue.

### D.

■ Brock's final ground for relief is that he was denied effective assistance of counsel. First, he complains that his appointed counsel displayed his ineffectiveness on voir dire when he failed to make proper *Witherspoon* objections. Although defense counsel's objections may well have been inartful, they were sufficient to preserve grounds for appellate review. The state court considered each and every *Witherspoon* contention on the merits. Moreover, this court has independently examined these contentions as to prospective juror Shockley and has found them to be without merit.

Brock also complains that defense counsel introduced witnesses who revealed that Brock was a drug user and had a troubled past, information which, according to Brock, substantially reduced the prosecutor's burden of proof in showing that special issue number two (whether Brock would be a continuing threat to society) should be answered in the affirmative. Then Brock, apparently reversing his position, argues, first, that defense counsel should not have put on Mrs. Wilkey, a witness who testified that several hours before the killing Brock appeared to be free from the influence of drugs, and, second, that the defense acted improperly by not eliciting more information from Brock's mother and sister about Brock's childhood.

We believe that Brock's inconsistent analysis perfectly illustrates the discretionary nature of defense counsel's task. There are significant risks which inhere in any tactic adopted by the defense. The question we must answer is not whether defense counsel's tactics produced damage but, rather, whether those tactics were un-

reasonably risky. *Gray v. Lucas,* 677 F.2d 1086, 1092 (5th Cir.1982), *cert. denied,* 461 U.S. 910, 103 S.Ct. 1886, 76 L.Ed.2d 815 (1983); *see also Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (wide latitude given to attorneys in planning their trial strategy). We believe that the defense was fully justified in presenting evidence of Brock's drug use. Intoxication was the only conceivable explanation for the senseless murder of Sedita consistent with a view of Brock as a human being capable of compassion and deserving of mercy.[11]

We also believe that defense counsel's decision to put on Mrs. Wilkey, an apparent mother-figure for Brock who exhibited great affection for him, was reasonably calculated to demonstrate Brock's capacity for establishing a relationship of trust with other persons in his community. And whatever damage done by her testimony that Brock was sober several hours before the killing was significantly reduced by her testimony that she could not see his face very well because of his hair, her statement that heroin, not Brock, was responsible for Sedita's death and testimony by another defense witness that Brock was strung out on Truenals just before the murder.

As for the evidence presented by the defense showing that Brock had had a troubled childhood, we believe that this information was just as likely to evoke sympathy from the jury (perhaps making them more receptive to the notion that Brock should not be held personally responsible for having intoxicated himself) as it was to convince them that there was no hope that Brock could ever be reformed.

Finally, Brock argues that defense counsel allowed the state to introduce inadmissible evidence concerning Brock's prior conviction for burglary and that defense coun-

---

**11.** We also note that the jury received instructions from the court that it could consider the fact of Brock's intoxication in mitigation and that the jury could have reasonably taken this fact into account in answering either issue number one (whether the crime was deliberate and intentional) or issue number two (whether the defendant was a continuing threat to society).

sel permitted several prosecution witnesses, all store clerks, to testify that based upon a single encounter with Brock they knew his reputation in the community to be bad.

At the time of Brock's trial, Tex.Crim. Proc.Code art. 37.07(3)(a) (Vernon 1981) provided:

> Regardless of the plea and whether the punishment be assessed by the judge or the jury, evidence may be offered by the state and the defendant as to the prior criminal record of the defendant, his general reputation and his character. The term prior criminal record means a final conviction in a court of record, or a probated or suspended sentence that has occurred prior to trial, or any final conviction material to the offense charged.

Because the evidence of Brock's prior conviction for burglary was admissible under state law, defense counsel committed no error in failing to object. As for the spurious "reputation" testimony offered by the store clerks we find no reasonable probability, in light of defendant's prior record and the peculiarly brutal circumstances surrounding Sedita's death, that the jury's conclusions would have been changed had there been no presentation of the store clerks' testimony.

Finding, with respect to Brock's second claim, that he has failed to overcome the *Strickland* presumption that his counsel's conduct fell within the wide range of reasonable professional assistance, and with respect to his first and third claims, that Brock suffered no prejudice, we affirm the district court's finding that Brock was not denied effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (defendant alleging ineffective assistance of counsel must prove (1) incompetent representation and (2) prejudice).

We **AFFIRM** the district court's order denying Brock's application for writ of habeas corpus and **VACATE** the stay of execution previously entered herein.