Leonard Marvin LAWS, Appellee,

v.

Bill ARMONTROUT, Appellant.

No. 87–1018.

United States Court of Appeals,
Eighth Circuit.

Submitted April 14, 1987.

Decided Dec. 9, 1987.

Stephen D. Hawke, Asst. Atty. Gen., Jefferson City, Mo., for appellant.

Barry A. Short, St. Louis, Mo., appointed, for appellee.

Before McMILLIAN, FAGG and MAGILL, Circuit Judges.

MAGILL, Circuit Judge.

The State of Missouri appeals from the district court's grant of habeas corpus relief to Laws. The district court vacated Laws' death sentence after concluding that Laws had received ineffective assistance of counsel during the punishment phase of his trial. We reverse and reinstate the sentence, finding no valid claim of ineffectiveness of trial counsel.

## I. BACKGROUND.

In October of 1980, Leonard Laws was living in a two-room house trailer with George Clifton Gilmore, Gilmore's brother Norman, and several others in the Gilmore family. All three men were unemployed. George Gilmore suggested to his brother and Laws that they could make money easily by robbing old people and then killing them to prevent identification. The three bought shotguns and a rifle on October 8, 1980. In the early morning of October 29, 1980, they went to the home of Clarence and Lottie Williams, whom the Gilmores had known through an uncle. Mr. Williams was eighty-three years old and his wife was eighty-one. The assailants gained entry to the Williams' home after Laws cut the telephone line, then they tied Mr. and Mrs. Williams up in chairs. Laws threatened to cut off their fingers if they would not reveal where their money was concealed. They complied, and the three ransacked the house. Mr. and Mrs. Williams were then untied and taken into the bedroom. George Gilmore prepared to kill them with his twelve-gauge shotgun, and Laws suggested instead: "Let me hit them in the head with a ball bat." Gilmore, however, told Laws to go stand outside and see if he could hear the shotgun blasts, and Laws complied. Gilmore then shot Mrs. Williams, reloaded the weapon, then shot Mr. Williams. The first shot failed to kill Mr. Williams, and he tried to run toward the front door, so Gilmore shot him a second time, killing him. Laws then reentered the house. After removing property, the three poured fuel oil on the floor, which Laws lit, starting a fire which substantially destroyed the house.

## II. PRIOR PROCEEDINGS.

Laws received a four-day trial in St. Louis County, Missouri Circuit Court in July of 1982. A jury found him guilty of two counts of capital murder. The punishment phase of the case began on the morning of July 23, 1982, before the same jury. During this phase the State introduced evidence, through certified copies of judgments, that Laws had been convicted of two previous but separate capital murders in Missouri,[1] for which he received life sentences, two armed robberies in Arizona, for which he received concurrent five to six-year sentences, and one aggravated assault in Mississippi, for which he received an eleven-year sentence. Laws was imprisoned in March of 1982 in the Missouri State Penitentiary for his first Missouri murder conviction, and he has been incarcerated ever since. Laws had previously spent a little over six years in prison on the armed robbery and aggravated assault convictions before being paroled. Laws' lawyer, although arguing on his behalf, introduced no evidence of mitigating circumstances.[2] The trial court nonetheless gave the jury an instruction which directed it to consider any mitigating circumstances.[3] The jury

1. *See State v. Laws,* 668 S.W.2d 234 (Mo.App. 1984); *State v. Laws,* 699 S.W.2d 102 (Mo.App. 1985). In the first case, Laws and the Gilmore brothers decided to rob Woodrow Wilson Elliott on the night of October 7, 1980. Elliott was an old man who lived alone and had no legs and only one arm. The trio drove to Mr. Elliott's house and when he answered the door, Laws kicked him, jumped on him, and choked him into unconsciousness. They then ransacked the house, during which time Laws stabbed Mr. Elliott in the back of the head. Before leaving with their loot, they set fire to Mr. Elliott's home. The three might not have been arrested if Laws had not demonstrated to Gilmore's relatives "how he had stabbed Mr. Elliott, and laughing, said words to the effect that Elliott had had such a hard head that it bent his knife." *Laws,* 668 S.W.2d at 237. In the second case, the evidence showed that in the early morning of December 29, 1980, Laws broke into a shed belonging to Mrs. Elizabeth Roderique. He took a gasoline can from the shed into Mrs. Roderique's home, carried the gasoline into her bedroom, and set her house on fire. Mrs. Roderique's body was found on the remains of her bed, but the body was so badly charred and burned that the cause of death could not be determined by autopsy. Laws, however, admitted that he had killed her. *Laws,* 699 S.W.2d at 103–04.

2. In capital murder cases, Missouri law directs the judge to consider, or to include in his instructions to the jury for it to consider, circumstances relevant to the crime which tend to aggravate or mitigate its severity. Mo.Rev.Stat. § 565.012 (1982) provides a list of aggravating and mitigating circumstances and also directs consideration of any aggravating or mitigating circumstances otherwise authorized by law. The statute further provides that the death penalty shall not be imposed unless at least one of the listed statutory aggravating circumstances is found. § 565.012.5. In this case the jury found the following four statutory aggravating circumstances were present:

(1) "The defendant has a substantial history of serious assaultive convictions." (§ 565.012.2(1)).
(2) "The murder of each victim was committed while the defendant was engaged in the commission of capital murder of the other victim." (§ 565.012.2(2)).
(3) "The defendant murdered Lottie and Clarence Williams for the purpose of receiving money or any other thing of monetary value." (§ 565.012.2(4)).
(4) "The murders of Lottie and Clarence Williams involved depravity of mind and that as a result thereof it was outrageously wanton and horrible." (§ 565.012.2(7)).
Tr. Vol. II at 813–14.
On appeal the Missouri Supreme Court did not decide whether the last circumstance was supported by the evidence, because it found that the first three were soundly established by the evidence. *State v. Laws,* 661 S.W.2d 526, 532 (Mo. banc 1983), *cert. denied,* 467 U.S. 1210, 104 S.Ct. 2401, 81 L.Ed.2d 357 (1984).

3. The instruction, Instruction No. 30, read as follows:
If you decide that a sufficient aggravating circumstance or circumstances exist to warrant the imposition of death, as submitted in Instruction No. 28, it will then become your duty to determine whether a sufficient mitigating circumstance or circumstances exist which outweigh such aggravating circumstance or circumstances so found to exist. In deciding that question you may consider all of the evidence relating to the murders of Clarence and Lottie Williams.
You may also consider
1. Whether the defendant was an accomplice in the murder of Clarence or Lottie Williams and whether his participation was relatively minor.
2. Whether the defendant acted under extreme duress or substantial domination of another person.
You may also consider any circumstances which you find from the evidence in extenuation or mitigation of punishment.

returned a verdict fixing Laws' punishment at death. Laws' motion for a new trial was overruled on September 17, 1982, and he was sentenced to death on each count of capital murder. Laws appealed, represented by new counsel, but the conviction and sentence were affirmed in full. *State v. Laws*, 661 S.W.2d 526 (Mo. banc 1983), *cert. denied*, 467 U.S. 1210, 104 S.Ct. 2401, 81 L.Ed.2d 357 (1984). Rehearing was denied on December 20, 1983. Laws then filed a *pro se* motion pursuant to Mo.S.Ct.R. 27.26, alleging ineffective assistance of counsel.[4] New counsel was appointed for him, and on November 16, 1984, an evidentiary hearing was held on the Rule 27.26 motion before a different judge from the one presiding over Laws' trial. The court found no showing of incompetence by Laws' trial counsel, and Laws appealed. The Missouri Court of Appeals affirmed the denial of relief. *Laws v. State*, 708 S.W.2d 182 (Mo.App.1986). Laws' motions for rehearing and for transfer were denied on March 25, 1986 and May 13, 1986. He then unsuccessfully petitioned to the Supreme Court for certiorari. *Laws v. State*, —— U.S. ——, 107 S.Ct. 246, 93 L.Ed.2d 171 (1986).

Thus, after eight unsuccessful attempts in the state court system, four of them alleging ineffective assistance of counsel, Laws began the federal attack upon his sentence, filing a *pro se* petition for writ of habeas corpus in the district court pursuant to 28 U.S.C. § 2254. Counsel was appointed for him, and in his amended petition he raised two arguments. He first argued that he was denied effective assistance of trial counsel in violation of the sixth and fourteenth amendments, when his court-appointed attorney failed totally to put on any evidence in mitigation during the punishment phase of his trial.[5] In support of this contention he argued that the following mitigating evidence should have been investigated and presented: First, Laws' honorable service record in Vietnam; and second, hospital psychiatric records and family testimony, showing how his psyche had been changed by his time serving in Vietnam. Laws also argued that the imposition of the death penalty violated his eighth and fourteenth amendment rights in that Laws was only an accomplice and had no direct role in the killing of the victims. Laws sought only a new trial of the death penalty phase, and did not raise issues regarding his counsel's handling of the guilt phase of his trial. In an unpublished memorandum opinion, the district court granted Laws' habeas corpus petition and vacated his two consecutive death sentences, giving

---

If you unanimously decide that a sufficient mitigating circumstance or circumstances exist which outweigh the aggravating circumstance or circumstances found by you to exist, then you must return a verdict fixing defendant's punishment at imprisonment for life by the Division of Corrections without eligibility for probation or parole until he has served a minimum of fifty years of his sentence.

**4.** At the time Laws filed his motion, Missouri Supreme Court Rule 27.26 provided in pertinent part:

A prisoner in custody under sentence and claiming a right to be released on the ground that such sentence was imposed in violation of the Constitution and laws of this State or the United States, or that the court imposing such sentence was without jurisdiction to do so, or that such sentence was in excess of the maximum sentence authorized by law or is otherwise subject to collateral attack, may file a motion at any time in the court which imposed such sentence to vacate, set aside or correct the same. Unless the motion and the files and records of the case show to the

satisfaction of the court that the prisoner is entitled to no relief, the court shall cause notice thereof to be served on the prosecuting attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto. If the court finds that the judgment was rendered without jurisdiction or that the sentence imposed was illegal or otherwise subject to collateral attack, or that there was such a denial or infringement of the constitutional rights of the prisoner as to render the judgment subject to collateral attack, the court shall vacate and set aside the judgment and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

**5.** To avoid potential confusion, we note that although Laws had a total of four separate counsel representing him on his various motions and appeals, his only claim of ineffectiveness of counsel is against his Missouri trial attorney, and alleges ineffective assistance only during the penalty phase, not the guilt phase, of his trial.

the State the opportunity to retry the punishment phase of the case.[6]

## III. STANDARD OF REVIEW.

■ In considering an appeal from the granting of habeas corpus relief on the ground of ineffective assistance of counsel, this court may engage its own independent review of the district court's conclusion, because the issue of ineffective assistance of counsel presents a mixed question of law and fact. *Martin v. McCotter*, 796 F.2d 813, 817 (5th Cir.1986), *cert. denied*, ——— U.S. ———, 107 S.Ct. 935, 93 L.Ed.2d 985 (1987); *Reiger v. Christensen*, 789 F.2d 1425, 1427 (9th Cir.1986). If a state court has rendered specific predicate factual findings, those findings should be presumed correct unless certain conditions exist which cast those findings into doubt. 28 U.S.C. § 2254(d); *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981); *Martin*, 796 F.2d at 817. The district court's findings of fact, however, are reviewable under the clearly erroneous standard. Fed.R.Civ.P. 52(a); *Morrow v. Parratt*, 574 F.2d 411, 413 (8th Cir.1978); *see also Martin*, 796 F.2d at 817.

## IV. DISCUSSION.

The State points to a number of flaws in the district court's opinion. We find three of these flaws serious enough to mandate reversal.

First, although it is unclear whether the district court intended to do so, it appeared to set out an erroneous legal test for determining ineffective assistance of counsel, a test that departs from the one the Supreme Court set out in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 2d 674 (1984). Second, the district court erroneously considered and in part based its conclusion of ineffective counsel on a claim that was not raised in the state courts and was therefore not properly be-

fore the district court. Third, as to the claims properly before it, the district court reached a conclusion of ineffective assistance of counsel that was not supported by the state court factual findings.

### A. Erroneous Legal Test for Ineffectiveness of Counsel.

■ The State argues that the district court wrongly established a *per se* rule, by holding that trial counsel would be found ineffective whenever a defendant received the death penalty and counsel had offered no evidence in mitigation. The State argues that such a *per se* rule flies in the face of both *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and *Darden v. Wainwright*, 477 U.S. 187, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), because in both cases no mitigating evidence was put on in the punishment phase, yet the death sentences were upheld. Examining the district court's analysis and the applicable cases, we agree with the State's argument.

The district court found that counsel's decision not to present mitigating evidence was based on: (1) his belief that a jury would not impose the death penalty since Laws had not directly participated in the killings; (2) his discussion with a juror from Laws' earlier capital murder case indicating that the jury had decided not to impose the death penalty because of a deal, also applicable to this case, the State had made with Gilmore; and (3) his phone conversations with one of Laws' brothers and a woman he thought was Laws' stepmother. The court found that these three factors did not represent:

a reasonably thorough investigation into petitioner's character and background or into other information potentially relevant to mitigating circumstances. The

---

**6.** The district court based its decision on Laws' ineffectiveness claim and declined to reach his eighth amendment claim, which argued essentially that because he was not the triggerman, the death penalty was inappropriate. Laws' eighth amendment claim is not before us on appeal. We note nevertheless that the Supreme Court's recent decision in *Tison v. Arizona*, ——— U.S. ———, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987),

is dispositive of this issue. In *Tison* the Supreme Court held that the eighth amendment does not prohibit the death penalty as disproportionate in the case of a defendant who, even though he neither intends to kill the victims nor inflicts the fatal wounds, nonetheless shows major participation in the felony which results in murder and has a mental state of reckless indifference to the value of human life.

record does not reflect counsel's investigation of petitioner's military or psychiatric background for purposes of the punishment phase of the trial. Nor does the record reflect a responsible effort to glean available relatives' own knowledge of and relationship to petitioner * * *.

Mem.Op. at 22.

Calling counsel's decision to offer no evidence at the penalty phase "a bold tactic," the court stated that: "Had it succeeded, its brilliance may have been unquestioned. Having failed, it must be considered beyond the bounds of professional norms." The court concluded:

Trial counsel may well believe he had reasonable grounds for the decision he reached in the death penalty phase of this cause. Nonetheless, that decision was wrong. * * * To a certain extent, we risk developing a body of law that says at the death penalty phase defense counsel must introduce some evidence or be found ineffective, while it is certainly possible and sometimes probable that putting on and offering evidence may worsen the client's chances. Perhaps this ruling stresses only the importance of fully investigating each case on its merits before deciding that as a matter of reasonable strategy, no evidence should be introduced.

Mem.Op. at 25.

Although the district court's conclusion may purport not to create a new rule in this area of the law, we nonetheless think that the court's reasoning is inconsistent with Supreme Court precedent, specifically, the *Strickland* and *Darden* decisions.

■ The district court's analysis is incorrect for the reason that the test set out in *Strickland* for determining whether counsel has functioned effectively is not outcome-determinative. Merely because a person was convicted does not mean the person received ineffective assistance of counsel. As *Strickland* and *Darden* make clear, the decision not to present evidence at the penalty phase is well within the range of practical choices not to be second-guessed, if the decision is based on an informed and reasoned judgment.

*Strickland* involved a challenge to counsel's handling of the sentencing portion of a death penalty capital murder case. To prepare for the sentencing hearing before the judge, counsel spoke to the defendant about his background. He also spoke on the telephone with defendant's wife and mother, though he did not follow up on one unsuccessful effort to meet with them. He did not otherwise seek out character witnesses. Nor did he request a psychiatric examination, since his conversations with the defendant gave no indication that he had psychological problems. Counsel decided not to present and hence not to look further for evidence concerning the defendant's character and emotional state. Counsel's rationale was in part that by forgoing the opportunity to present new evidence on these subjects, he prevented the State from cross-examining the defendant on his claim and from putting on psychiatric evidence of its own. At the sentencing hearing, counsel's strategy was based primarily on the trial judge's prior remarks and his reputation as a sentencing judge who thought it important for a convicted defendant to own up to his crime. Counsel argued that the defendant's remorse and acceptance of responsibility for his crime, his total lack of prior criminal conduct, the fact that he surrendered, confessed, offered to testify against a co-defendant, and the fact that he was a good person gone wrong under stressful circumstances all combined to justify sparing him from the death penalty. The strategy failed, and the trial judge sentenced the defendant to death.

The Supreme Court found that defendant's counsel had not been ineffective. Counsel had made:

a strategic choice to argue for the extreme emotional distress mitigating circumstance and to rely as fully as possible on respondent's acceptance of responsibility for his crimes. * * * Counsel's strategy choice was well within the range of professionally reasonable judgments, and the decision not to seek more character or psychological evidence than was already in hand was likewise reasonable. * * * The aggravating circum-

stances were utterly overwhelming. Trial counsel could reasonably surmise from his conversations with respondent that character and psychological evidence would be of little help. * * * On these facts, there can be little question, even without application of the presumption of adequate performance, that *trial counsel's defense, though unsuccessful, was the result of reasonable professional judgment.*

*Strickland,* 466 U.S. at 699, 104 S.Ct. at 2070 (Emphasis added.)

*Darden v. Wainwright,* 477 U.S. 187, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), presented a similar scenario. In *Darden,* a Florida defendant who had been sentenced to death for murder argued that he was denied effective assistance of counsel at the sentencing phase of trial. He argued that his team of trial counsel did not delve sufficiently into his background, and as a result were unprepared to present mitigating evidence at the sentencing hearing. Counsel knew that they were free to offer mitigating evidence, yet they chose not to do so. The Court, noting that *Strickland* requires judicial scrutiny of counsel's performance to be highly deferential, stated:

In this case, there are several reasons why counsel reasonably could have chosen to rely on a simple plea for mercy from petitioner himself. Any attempt to portray petitioner as a non-violent man would have opened the door for the State to rebut with evidence of petitioner's prior convictions. * * * In addition, * * * the State could have responded with a psychiatric report * * *. In sum, petitioner has not "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" * * * Petitioner has failed to satisfy the first part of the *Strickland* test, that his trial counsels' performance fell below an objective standard of reasonableness.

*Darden,* 106 S.Ct. at 2474–75, quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.

The Supreme Court recently reaffirmed this standard in *Burger v. Kemp,* —— U.S. ——, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987). In *Burger,* a Georgia jury found the defendant guilty of murder and sentenced him to death. The Supreme Court, noting the high degree of deference given to counsel on a claim of ineffectiveness, rejected the defendant's contention that his trial counsel had been ineffective for failing to develop and present any mitigating evidence at either of the two sentencing hearings.

In *Burger,* the potential mitigating evidence would have disclosed that the defendant had an unhappy and unstable childhood. Trial counsel was aware of some, but not all, of this family history before trial. After speaking with the defendant's mother, a psychologist, and others, counsel "made the reasonable decision that his client's interest would not be served by presenting this type of evidence." *Burger,* 107 S.Ct. at 3124. Counsel decided not to put the defendant's mother on the stand because her testimony might have been counterproductive, and the Court noted that "it was surely not unreasonable for [counsel] to have concluded that cross-examination might well have revealed matters of historical fact that would have harmed his client's chances for a life sentence." *Id.* at 3125. The Court concluded:

The record at the habeas corpus hearing does suggest that [counsel] could well have made a more thorough investigation than he did. Nevertheless, in considering claims of ineffective assistance of counsel, "[w]e address not what is prudent or appropriate, but only what is constitutionally compelled." *United States v. Cronic,* 466 U.S. 648, 665, n. 38 [104 S.Ct. 2039, 2050, n. 38, 80 L.Ed.2d 657] (1984). We have decided that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland,* 466 U.S., at 690–691 [104 S.Ct. at 2065–2066]. Applying this standard, we agree with the courts below that counsel's decision not to mount an all-out investigation into petitioner's background in search of mitigating circumstances was supported by

reasonable professional judgment. It appears that he did interview all potential witnesses who had been called to his attention and that there was a reasonable basis for his strategic decision that an explanation of petitioner's history would not have minimized the risk of the death penalty. Having made this judgment, he reasonably determined that he need not undertake further investigation to locate witnesses who would make statements about [the defendant's] past.

*Id.* at 3125–26.

Applicable circuit court decisions are in accord. *See Lightbourne v. Dugger,* 829 F.2d 1012, 1025–26 (11th Cir.1987); *Robison v. Maynard,* 829 F.2d 1501, 1504–05 (10th Cir.1987); *Bell v. Lynaugh,* 828 F.2d 1085, 1089–90 (5th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 310, 98 L.Ed.2d 268 (1987); *Brock v. McCotter,* 781 F.2d 1152, 1160 (5th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 2259, 90 L.Ed.2d 704 (1986).[7]

Laws points to a number of cases in which counsel was found ineffective for having failed to present mitigating evidence. In these cases, however, the key to a finding of ineffectiveness was not that the mitigating evidence was not presented, but that counsel, as a result of inadequate preparation, had failed to discover the evidence. Contrary to the district court's apparent reasoning in this case, the fact that mitigating evidence is not set forth does not inexorably lead to a conclusion of ineffective counsel. One must look further as to why the mitigating evidence was not produced. If counsel has through neglect failed to discover such evidence, then counsel will be found ineffective. If, however, the mitigating evidence is not produced because counsel, after a reasonable investigation and exercise of professional judgment, has determined that withholding such evidence is the more strategically sound course, then there has been no ineffectiveness.[8]

*Kimmelman v. Morrison,* 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986), cited by Laws, supports this view. In *Kimmelman,* the defendant was indicted for rape. Among the items of evidence used at trial was a stained bed sheet, which was obtained from defendant's apartment without a search warrant. At trial, counsel objected to the introduction of the sheet and testimony concerning it. State law, however, required that suppression motions be filed within thirty days of the indictment. Because the time limit had long since passed, the trial judge denied the motion as late. Ultimately, defendant was convicted. The Supreme Court observed that trial counsel "failed to file a timely suppression motion, not due to strategic considerations, but because, until the first day of trial, he was unaware of the search and of the State's intention to introduce the bedsheet into evidence." *Kimmelman,* 106 S.Ct. at 2588. Counsel was unaware of the search and seizure because he had failed to conduct any pretrial discovery. Again, this failure was not based on strategy, but on counsel's erroneous belief that the State was obligated to turn over inculpatory evidence to the defense before trial and that

---

**7.** The *Brock* court rejected an outcome-determinative analysis as follows:

We believe that Brock's inconsistent analysis perfectly illustrates the discretionary nature of defense counsel's task. There are significant risks which inhere in any tactic adopted by the defense. The question we must answer is not whether defense counsel's tactics produced damage but, rather, whether those tactics were unreasonably risky.

*Brock,* 781 F.2d at 1160. The court went on to hold that counsel was not ineffective for introducing evidence of petitioner's drug use and troubled childhood. The court noted that this information, like Laws' family testimony or information pertaining to his personality, is susceptible to dual interpretation.

**8.** The district court appears to have rested its decision on two bases. The first basis, as we have discussed, is that because counsel presented no evidence in mitigation, he was therefore ineffective. However, as we note, the correct test is not whether there was no mitigating evidence, but rather, whether the lack of mitigating evidence was the result of adequate investigation and sound strategy. The district court also appeared to conclude, as a second, independent basis for decision, that even under the established *Strickland* test, counsel was ineffective for having conducted inadequate investigation. As we discuss in Section IV(C) of this opinion, we think the district court's analysis on this ground was also incorrect.

the victim's preferences would determine whether the State proceeded to trial after an indictment had been returned. The Court found that counsel's failure to conduct any discovery was "unreasonable, that is, contrary to prevailing professional norms. * * * Respondent's lawyer neither investigated, nor made a reasonable decision not to investigate, the State's case through discovery." Counsel had a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Kimmelman*, 106 S.Ct. at 2588–89.

Laws also cites *Morrow v. Parratt*, 574 F.2d 411 (8th Cir.1978); *Eldridge v. Atkins*, 665 F.2d 228 (8th Cir.1981), *cert. denied*, 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed. 2d 168 (1982); and *Woodard v. Sargent*, 806 F.2d 153 (8th Cir.1986). As in *Kimmelman*, however, these cases stand for the proposition that inadequate trial preparation and investigation equal ineffective assistance of counsel, not the fact, standing alone, that potentially mitigating evidence is not introduced. In *Morrow*, the court found that the defendant's lawyer had failed to adequately investigate the facts before advising his client to plead guilty and had failed to interview any eyewitnesses to the crime. The court concluded: "In summary, the evidence described above could have been uncovered by a reasonable investigation by Morrow's attorney." *Morrow*, 574 F.2d at 414.

In *Eldridge*, defense counsel did not interview any of the eyewitnesses to the robbery. "Counsel did not investigate because he conclusorily decided that Eldridge was guilty and that further investigation would not do any good." *Eldridge*, 665 F.2d at 235. Noting also that counsel's failure to use certain witnesses was not so much trial strategy as it was an accommodation to his own inadequate trial preparation, the court concluded that: "Counsel need not attain perfection, but he must exercise reasonable diligence to produce exculpatory evidence." *Id.*

Finally, in *Woodard*, a capital murder case, counsel was found ineffective for failing to request a jury instruction on a new mitigating circumstance which had been added to the pertinent statute shortly before the case was tried. The jury found two aggravating circumstances and no mitigating circumstances. Accordingly, the court found:

A finding of a mitigating circumstance should have been an important objective in Woodard's case, and the failure to seek the inclusion of this obvious mitigating circumstance certainly fell below the threshold of reasonably competent assistance. * * * [W]e can conceive of no possible tactical reason for such an omission.

*Woodard*, 806 F.2d at 157.

As these cases show, it is not the failure to present mitigating circumstances, but rather the reasons for the failure to present mitigating circumstances, that are the proper subject for judicial scrutiny. Therefore, we hold that the district court erred in setting out a *per se* rule in this regard.

**B. Whether the District Court Properly Considered Laws' "Vietnam Experience."**

We find the district court erred in another significant respect. In his habeas corpus petition, Laws argued that his trial counsel was ineffective for failing to present mitigating evidence relating to his time spent in Vietnam and its effect on him. The State argued before the district court, and argues here, that Laws may not raise his "Vietnam experience" argument in federal court. The State maintains that because Laws failed to raise an issue concerning Vietnam either during his Rule 27.-26 litigation in Missouri state court or on appeal from the denial of Rule 27.26 relief, this claim is subject to procedural default and alternatively, that the claim is unexhausted because the Missouri courts have not been provided with a fair opportunity to apply controlling legal principles to the facts bearing upon his claim of ineffective counsel.

The district court found, however, that the exhaustion rule was not a bar to

consideration of Laws' claims.[9] Although the court noted that Laws had not raised an argument concerning his Vietnam experience before the state courts, it nonetheless found that argument to be "part and parcel" of Laws' claims concerning mental health and family testimony. The court concluded that "[e]ither type of evidence [mental health evidence or the testimony of relatives] could have elicited information regarding petitioner's military service or his pre-service and post-service well-being." Mem.Op. at 19–20. The district court, in sum, held that because evidence regarding Laws' military service and its effect on him could have surfaced through evidence as to his general mental health or through the testimony of family members, that the Vietnam claim was part and parcel of both the mental health and family testimony claims, and thus the claim had been exhausted and was properly before the district court.

■■■ We believe this issue requires a more thorough examination. The "total exhaustion" rule was first announced in *Rose v. Lundy,* 455 U.S. 509, 522, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). Under this rule, every claim raised in the petitioner's federal habeas corpus petition must be "exhausted" before the federal court can review the merits of any claim in the petition. There are two independent steps to exhausting a claim. First, the petitioner must have fairly presented the federal constitutional dimensions of his federal habeas corpus claim to the state courts. 28 U.S.C. § 2254(b). If the petitioner has not fairly presented the federal constitutional dimensions of his claim to the state courts, he will still meet the exhaustion requirement if there are no currently available, non-futile state remedies through which he can present the federal constitutional dimensions of his claim to the state courts. 28 U.S.C. § 2254(b) and (c). Thus, the "question with respect to exhaustion is not merely whether [the petitioner] has in the past presented his federal claim to the state

courts, but also whether there is, under the law of Missouri, any presently available state procedure for the determination of the merits of that claim." *Thomas v. Wyrick,* 622 F.2d 411, 413 (8th Cir.1980).

■■■ With this background in mind, we must determine whether Laws' "Vietnam experience" argument is indeed "part and parcel" of the mental health claim he properly raised in the state courts. In other words, we must decide whether his Vietnam experience claim has been fairly presented to the state courts. This issue must be resolved as a matter of federal law, not state law. *Rodgers v. Wyrick,* 621 F.2d 921, 927 (8th Cir.1980).

■■■ The purpose of the fair presentation component of the exhaustion requirement is to give the state courts the first opportunity to review federal constitutional issues and to correct federal constitutional errors made by the state's trial courts. Thus, a petitioner need give only the substance of his claim to the state courts. But to do so, the petitioner must include the same facts and legal theories to the state court that he seeks to present to the federal court so that the state court can apply the controlling legal principles to the facts bearing upon his federal constitutional claim. *Picard v. Connor,* 404 U.S. 270, 277, 92 S.Ct. 509, 513, 30 L.Ed.2d 438 (1971). To reiterate, "the petitioner must have informed the state court of both the *factual and the legal* premises of the claim he asserts in federal court." *Daye v. Attorney General of State of New York,* 696 F.2d 186, 191 (2d Cir.1982) (en banc). (Emphasis added.)

■■■ We accept that the legal basis for Laws' "Vietnam experience" claim is the same as was before the state courts. Throughout the Rule 27.26 litigation and in the federal courts, Laws has claimed a denial of effective assistance of trial counsel, in contravention of the sixth amendment, as a result of inadequate effort by

**9.** The exhaustion doctrine is fully applicable to cases involving the death penalty. In *Strickland,* a capital murder case in which the death penalty was upheld, the Supreme Court noted that while the exhaustion rule was not jurisdictional, it was nonetheless "to be strictly enforced." *Strickland,* 466 U.S. at 684, 104 S.Ct. at 2063.

counsel to investigate his mental state. In this respect, a claim that Laws' psychiatric condition was heavily influenced by his time in Vietnam is indeed "part and parcel" of his claim as to ineffective assistance of counsel.

■ Whether the factual basis for this claim was before the state courts is a different matter, however. It is well-settled that a petitioner must present the state courts with precisely the same factual underpinnings of his federal constitutional argument that the petitioner wishes to use to support his claim in his federal habeas corpus petition. Thus, if in federal court the petitioner relies on facts that give the case a significantly different and stronger evidentiary posture than it had when the state courts considered it, the state courts must be given an opportunity to consider the evidence. *Joyner v. King*, 786 F.2d 1317, 1319–20 (5th Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 653, 93 L.Ed.2d 708 (1986).

The Sixth Circuit undertook an extensive survey of cases on this subject in *Sampson v. Love*, 782 F.2d 53 (6th Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 159, 93 L.Ed.2d 98 (1986). The court found cases from the First, Second, Fifth, Ninth and Tenth Circuits, all holding that where a habeas corpus petitioner presents new facts to the federal court that were not presented to the state courts, the petition should be dismissed to give the state courts the first opportunity to consider the claim in light of the new facts. *Domaingue v. Butterworth*, 641 F.2d 8 (1st Cir.1981) ("petitioner's 'ineffective assistance of counsel' claim depended in large measure on factual allegations outside the record on direct appeal to the state courts"); *United States ex rel. Boodie v. Herold*, 349 F.2d 372 (2d Cir. 1965) ("The state courts have not been given any opportunity to pass upon these important [constitutional] questions in the light of all the relevant facts"); *Brown v. Estelle*, 701 F.2d 494 (5th Cir.1983) ("The state courts must have had an opportunity to pass on the claim in light of a full record and where the factual basis for a claim was not presented to the state courts, the claim is unexhausted"); *Schiers v. People of*

*State of California*, 333 F.2d 173 (9th Cir. 1964) ("state remedies had not been exhausted because petitioner's contention rests upon a cumulation of many asserted delinquencies not heretofore presented to the state courts"); *Jones v. Hess*, 681 F.2d 688 (10th Cir.1982) ("A federal claim is unexhausted where it presents 'a materially different claim and stronger evidentiary case' than was before the state court").

This court reached the same conclusion in *Stranghoener v. Black*, 720 F.2d 1005 (8th Cir.1983). In *Stranghoener*, the petitioner claimed that his guilty plea was not entered voluntarily and alleged several factual reasons why it was not voluntary; *e.g.*, drugs and ineffective assistance of counsel. Some of these factual reasons were not presented to the state courts. The *Stranghoener* court held that the petitioner had not fairly presented the involuntary guilty plea claim to the state courts because of the different factual basis for the claim. The court ruled: "we hold that a federal claim is not 'fairly presented' to the state courts when factual allegations significantly affecting the determination of that claim are raised for the first time in federal court." *Stranghoener*, 720 F.2d at 1007. *See also Tyler v. Wyrick*, 730 F.2d 1209, 1210 (8th Cir.), *cert. denied*, 469 U.S. 838, 105 S.Ct. 138, 83 L.Ed.2d 78 (1984).

Laws' argument concerning his "Vietnam experience" falls squarely within the reasoning of these cases. The argument concerns Laws' service record, including in its scope facts about his combat experience, his citations received for duty, and his discharge record. As the State points out, the argument also opens the door to cross-examination as to facts about Laws' drug usage while in the service, an auto theft charge, and an AWOL conviction. The argument also concerns Laws' mental state, including in its scope facts about his personality before and after his military service, revealed through psychological tests and family perceptions. Introduction of these facts opens the door to cross-examination as to whether Laws' disturbed mental state resulted not from his time in Vietnam but from his more than six years in prison. None of these facts were before

the state courts. The state courts were never presented with or given the opportunity to consider a "Vietnam experience" claim. Accordingly, Laws' many factual allegations concerning Vietnam make his claim a different one from that presented to the state courts. We therefore hold that Laws has not properly exhausted this claim in the state court system.

The next step in our analysis is to determine whether there are any currently available, non-futile state remedies through which Laws can present his claim to the state courts. If such avenues exist, we must dismiss Laws' petition. He would then have the option of either returning to state court to present his unexhausted claims, or amending his petition to delete the unexhausted claims, then resubmitting to the federal court the fully exhausted petition. See Rose v. Lundy, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). Our study of Missouri law leads us to conclude that such a state remedy is not available to Laws. In Eaton v. Wyrick, 528 F.2d 477, 482 (8th Cir.1975), this court stated that "[o]nly after some clear manifestation on the record that a state court will not entertain petitioner's constitutional claims even if fairly presented will the exhaustion requirement be disregarded as futile." Accord, Smallwood v. Missouri Board of Probation and Parole, 587 F.2d 369, 371 (8th Cir.1978); Rodgers v. Wyrick, 621 F.2d 921, 925 (8th Cir.1980).

In Lindner v. Wyrick, 644 F.2d 724 (8th Cir.), cert. denied, 454 U.S. 872, 102 S.Ct. 345, 70 L.Ed.2d 178 (1981), this court examined this issue under Missouri law in the context of a successive Rule 27.26 motion. The court noted that Missouri courts have strictly construed the provision in Rule 27.-26 that a second motion to vacate a sentence shall not be entertained when the grounds in the second motion could have been raised in the original motion. Lindner, 644 F.2d at 726–27. Under Missouri law, the result of the proceeding on the first post-conviction motion forecloses both those claims which were alleged and those claims which could have been alleged but were not. Furthermore, where the defend-ant possessed information upon which the second motion was based at the time when he filed the first motion, an allegation as to ineffective assistance of counsel in preparing the first post-conviction motion will not afford a basis for a second post-conviction motion. Id. at 727 n. 4. The Lindner court, however, recognizing that Rule 27.26 does not necessarily and absolutely foreclose a state court from entertaining a second or successive post-conviction motion, reaffirmed the Eaton rule requiring a clear indication in the state record that further state proceedings would be futile before abandoning the exhaustion requirement. Because Missouri law governing successive Rule 27.26 motions is clear, and because we find an equally clear indication in the state record that such a motion would not be heard in this case, we conclude that no point would be served by sending Laws back to state court to attempt to gain a hearing on this issue.

As we read the record, it is indisputable that Laws' argument relating to Vietnam was available to him and his counsel when he made his Rule 27.26 motion. In an affidavit prepared in support of his federal habeas petition, Laws stated: "During my trial preparation for the Williams case, [trial counsel] and I discussed very briefly my service in the army and in Vietnam from 1967 to 1970. I told him I had an honorable discharge. He never asked me about it again." During his closing argument of the punishment phase of Laws' trial, Laws' counsel mentioned that Laws had spent time in Vietnam: "when I was in Vietnam, I killed somebody. Okay, I killed somebody. I had to. Leonard Laws was in Vietnam. I killed somebody in those circumstances and I can remember the day, March 17th." Tr. Vol. II at 808. We also note that the Missouri trial judge who sentenced Laws was aware that Laws had been in Vietnam. The trial judge had before him the report of the presentence investigation on Laws, which revealed that Laws had spent time in Vietnam and had been honorably discharged from the United States Army.

The foregoing leads us to conclude that Laws had available to him the "Vietnam

experience" claim at the time of his first Rule 27.26 motion, and that under Missouri law, a successive Rule 27.26 motion on this ground would not be granted and is therefore futile.

Because we conclude that Laws has no currently available state remedies, we proceed to the next step in the analysis. Because Laws' "Vietnam experience" claim was not fairly presented to the state courts, nor can it now be, we examine whether Laws can demonstrate (1) adequate cause to excuse his failure to raise the claim in state court properly, and if he can show such cause, then he must also show (2) actual prejudice to his defense resulting from the state court's failure to address the merits of the claim. *See Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

The fact that defense counsel failed to recognize the factual or legal basis for a claim or failed to raise the claim despite recognizing it does not constitute "cause." *Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986). Attorney error or inadvertence short of ineffective assistance of counsel does not constitute "cause." Instead, the existence of "cause" must ordinarily turn on whether the petitioner can show that some objective factor external to the defense impeded counsel's efforts to comply with the state procedural rule. *Id.* 106 S.Ct. at 2645–46. A defendant represented by an attorney whose performance is not constitutionally ineffective under *Strickland* bears the risk of attorney error that results in a procedural default. The "cause" recognized by the *Murray* Court was "cause" that would be in itself an independent ground for relief, justifying habeas corpus relief.[10] In summary, allegations and proof of "cause" must rise to the level of constitutionally-cognizable ineffective assistance of counsel before the "cause" prong of *Wainwright v. Sykes* is met. *Murray v. Carrier*, 106

S.Ct. at 2644–46; *Smith v. Murray*, 477 U.S. 527, 106 S.Ct. 2661, 2667, 91 L.Ed.2d 434 (1986). Such a claim of ineffective assistance of counsel must be first presented to the state courts as an independent claim before it may be used to establish cause for a procedural default. *Murray v. Carrier*, 106 S.Ct. at 2646.

Laws has presented no reasons whatsoever for his failure to raise the "Vietnam experience" claim in state court. Moreover, he has made no allegations of ineffectiveness of counsel against any of his appellate counsel. We therefore conclude that Laws has not shown cause for his failure to raise his "Vietnam experience" claim in state court. In light of this conclusion, it is unnecessary for us to examine whether Laws suffered prejudice to his defense as a result of that failure.

To summarize, we hold that because Laws failed to raise his "Vietnam experience" claim before the state courts, and cannot demonstrate adequate cause for that failure, that claim was not cognizable on federal habeas corpus review, and it was error for the district court to consider it.

## C. Whether the District Court's Assessment of the Evidence was Erroneous.

Even if the district court had not created a framework for analysis that departs from established Supreme Court precedent (*see supra* section IV(A) of this opinion), we think the district court's assessment of the evidence, even under the correct standards, would mandate reversal. The district court concluded, applying the *Strickland* standards, that counsel had made an inadequate investigation and was thus ineffective. We believe this conclusion was contrary to the evidence. Presuming as we must the state court's factual findings to be correct, as required by 28 U.S.C.

---

10. We note that a petitioner cannot prove "cause" with a claim of ineffective assistance of Rule 27.26 trial counsel or appellate counsel since that claim cannot be an independent ground for relief justifying habeas corpus relief. *See Williams v. State of Missouri,* 640 F.2d 140,

143–44 (8th Cir.), *cert. denied,* 451 U.S. 990, 101 S.Ct. 2328, 68 L.Ed.2d 849 (1981); *accord, Kirby v. Dutton,* 794 F.2d 245, 247 (6th Cir.1986); *Mitchell v. Wyrick,* 727 F.2d 773, 774 (8th Cir.), *cert. denied,* 469 U.S. 823, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984).

§ 2254(d),[11] we are compelled to conclude that Laws received effective assistance of counsel.

Laws' arguments which the district court considered, and which are properly before this court, are as follows:

(1) Trial counsel failed to adequately investigate or introduce any evidence concerning Laws' mental state;

(2) Trial counsel failed to contact members of Laws' family so that they could testify on his behalf; and

(3) Trial counsel failed to present testimony from a statistician, priest and/or psychologist in opposition to the imposition of the death penalty.

We consider each issue in turn. Our analysis is governed by *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 2d 674 (1984). Under *Strickland*, a petitioner alleging ineffective assistance of counsel must prove two independent components:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064.

■ Turning first to examine whether counsel's performance was deficient, we note that the defendant must show that counsel's representation fell below an objective standard of reasonableness, considering all the circumstances. We recognize that our scrutiny of counsel's performance must be highly deferential, in view of the wide latitude counsel must have in making tactical decisions. We must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065.[12]

With these standards in mind, we examine Laws' three claims.

### 1. Failure to Adequately Investigate Laws' Psychological Background.

■ Laws makes the argument, maintained throughout the state court post-conviction proceedings, that his trial counsel failed to adequately investigate his past

11. The State argues that the state court's factual findings, which are supported by the record, are entitled to the presumption of correctness mandated by 28 U.S.C. § 2254(d). Laws argues, however, that the presumption of correctness is inapplicable because material facts were not adequately developed at the state court hearing, 28 U.S.C. § 2254(d)(3), and because the state court's factual determinations are not fairly supported by the record reviewed as a whole by the federal court, 28 U.S.C. § 2254(d)(8). We conclude, however, that Laws' arguments in this regard are belied by the record, which shows that material facts were adequately developed and had fair support in the record.

12. During the Rule 27.26 hearing, the following information concerning Laws' trial counsel came to light. He had been licensed to practice law in Missouri since 1975. After serving as a law clerk in the Missouri Court of Appeals and an assistant prosecuting attorney in St. Louis County for two years, he entered private practice, where, according to his estimate, ninety-five percent of his work was in criminal law. He handled approximately fifty felonies a year, and at the time of the hearing, had tried between twenty-five and thirty jury trials, as well as having briefed and argued criminal appeals. He represented Laws in both the Elliott and Williams murder trials and testified that he spoke with Laws for six or more hours on the Elliott trial, and spent additional time with him before the Williams trial. He further estimated that he spent about four hundred hours preparing for both murder trials. The two trials involved substantial overlap in witnesses and preparation. Finally, the chief trial attorney for the St. Louis Public Defender's office testified at the hearing that Laws' trial counsel had "an excellent reputation" as a defense lawyer in the community.

psychiatric treatment record and to explore a possible psychologically-based defense. Laws had undergone a psychiatric examination in the Mississippi State Hospital in 1974–75 while serving time in the Mississippi Penitentiary on an aggravated assault charge. Trial counsel, however, relied on a psychiatric exam of Laws conducted on September 22, 1981, at the Fulton State Hospital in connection with one of the two other capital murder charges which had been brought against Laws. The Fulton State Hospital examination, which took into account Laws' prior Mississippi examination, concluded that Laws was mentally capable of standing trial, and that he was able to know and appreciate the nature, quality and wrongfulness of the murders when he had committed them and had been capable of conforming his conduct to the requirements of the law. The record regarding this issue at the Rule 27.26 hearing is as follows:

Q. What were the results of this examination that you were aware of before the trial?

A. The findings were, from Roman Numeral VIII, that the accused had no mental disease or defect within the meaning of Section 552.010, and that Leonard had the capacity to understand the proceedings against him and knew and appreciated the nature and wrongfulness of his conduct.

Q. And do they also, on page four of this document, talk about an evaluation in Mississippi and what the diagnosis there was?

\* \* \* \* \* \*

A. It states that he was given the diagnosis of anti-social personality and situational reaction of adult life.

Q. So the doctor in the examination you reviewed also considered this Mississippi evaluation, is that right?

A. Yes.

Q. Now, you said besides this examination in Defendant's Exhibit B, you also considered Leonard Laws, his background, and your conversations with him. And what did you glean from that, if anything?

A. Well, in my conversations with him I didn't detect—again, its a lay opinion. But I didn't detect any mental disease or defect that would interfere with our preparing to go to trial, or for his standing trial.

Q. All right. *And so was that ever a plan, or a possible defense in your mind, a viable defense in any way to claim any mental disease or defect, based on your evaluation of this case?*

A. *Well, I considered it, but I rejected it.*

(Emphasis added.)

Q. Did Leonard at any time ever insist that he should be evaluated, or that he was insane in any way?

A. I don't recall that, no.

[Rule 27.26 Tr. at 73–74.]

\* \* \* \* \* \*

Q. [D]id you read through that psychiatric report when you represented Mr. Laws?

A. While I represented him, yes.

Q. And in that report, do you recall the term "situational reaction," that Mr. Laws suffered from problems with situational reactions?

A. Yes.

Q. And did you speak to the psychiatrist who prepared that report about what a situational reaction was?

A. No. I didn't.

Q. *And at this time, do you know what a situational reaction is?*

A. *A situational reaction does not rise to the level of mental disease or defect. I know that.*

Q. *But you did not investigate, at the time you represented Mr. Laws, exactly what a situational reaction was, what the scope of that was?*

A. *What the scope of it was, I have an understanding what it is. But I don't know the actual scope of it. And again, I read it. It was in the context of the individual's finding that there was no mental disease or defect.*

(Emphasis added.)

Q. Right. But when you represented Mr. Laws and read this report, did you at

any time talk to a psychiatrist or psychologist about what types of incidents aggravate situational reactions?

A. No, I didn't.

[Rule 27.26 Tr. at 83–84.]

The Rule 27.26 court, after hearing this testimony, found as fact that Laws:

> never gave any indication to his trial attorney or the trial court that he was mentally incompetent at the time of the trial herein or at the time of the offenses. In fact [Laws] had been examined on September 22, 1981, prior to the trial with respect to a third murder case against [Laws] in Washington County. The results of that examination show that [Laws] had no neurosis or psychosis.

The court then concluded that "There was no indication or evidence which required a new mental examination of [Laws]. Mental examination conducted pursuant to Chapter 552, further shows that [Laws] had no significant mental problems."

In reviewing the Rule 27.26 transcript and findings and conclusions of the Rule 27.26 court, the Missouri Court of Appeals found that "[c]lose examination of the transcript reveals that [trial counsel] made a reasoned strategic decision based on all the circumstances to refrain from putting on evidence at trial of [Laws'] psychiatric state." *Laws v. State,* 708 S.W.2d 182, 185 (Mo.App.1986). The court concluded:

> The evidence at movant's 27.26 hearing convinces us that [trial counsel] made a careful and conscious choice against putting on psychiatric evidence during trial or at the penalty stage. Nothing made known to counsel during his representation of movant, and extensive interviews with him, suggested to counsel that presenting evidence of movant's psychiatric state would be of any benefit in his defense. Counsel had a duty to make reasonable investigations or to make a reasonable decision that makes a particular investigation unnecessary. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. at 2067. Counsel could have well reasoned that the jury would be more harsh with movant as a result of learning

that his behavior could be erratic and violent. Contrary to movant's contention that counsel failed to ascertain the meaning and import of a "situational reaction," our review of the record leads to the conclusion that counsel was fully cognizant of the nature of this disorder and decided as a matter of sound trial strategy that it would not be helpful.

> [Counsel's] informed choice of trial strategy to refrain from presenting psychiatric evidence at trial or during the penalty stage rendered it unnecessary to engage in further inquiry into movant's psychiatric state.

*Id.* at 186.

The district court found, however, that trial counsel's decision not to present psychiatric evidence "was not based on a reasonably thorough investigation into [Laws'] character and background or into other information potentially relevant to mitigating circumstances. The record does not reflect counsel's investigation of [Laws'] military or psychiatric background for purposes of the punishment phase of the trial." Mem.Op. at 22.

We believe, however, that the record reveals that counsel acted well within the bounds of professional competency. The state court findings of fact were entitled to a presumption of correctness pursuant to 28 U.S.C. § 2254(d). We accept the state courts' legal conclusion of effectiveness based on those facts.

Counsel could easily have concluded that the decision to present psychological testimony would have disastrous consequences. Skillful cross-examination could have revealed that although Laws suffered from no mental impairment that would negate responsibility for the murders he had committed, he was nonetheless a maladjusted man with a propensity for violence. In view of the fact that Laws' psychological history revealed to counsel that he had no mental disease or defect, as well as the fact that in their interviews, Laws appeared normal and made no mention of any psychological impairment, for counsel to have nonetheless raised the issue of Laws' mental state at trial could have induced cross-

examination which would make counsel appear devious or unprepared, as well as alienating the jury against his client.

In sum, we conclude that under *Strickland,* counsel conducted an adequate investigation into a possible psychologically-related defense, and his performance in this regard cannot be considered deficient.

### 2. Failure to Contact and Interview Relatives.

■■■ Laws argues that his counsel erred in failing to adequately pursue an investigation of relatives who would be willing to testify on Laws' behalf. Again, this argument is contradicted by the facts as brought out in the Rule 27.26 hearing. The hearing transcript reveals the following:

Q. Now, other than George Gilmore, did Leonard Laws also request that you call some members of his family to testify, at least to the death penalty phase of that, if it came to that?

A. Yes, he did. He gave me a phone number of an individual which was either his father's trailer or his stepmother's trailer. I am not sure which. And it was in rural Missouri. I am not sure where it was. And I called numerous times.

Q. Did you get ahold of anyone?

A. I finally did, yes. I finally got ahold of the woman. And I don't recall her name right now, I'm sorry. But the woman who Leonard gave me her phone number. And it was late at night one night when I happened to catch her. *And I explained to her that we wished her to testify perhaps in the death phase of the case.*

Q. *What was her response?*

A. *She refused.*

(Emphasis added.)

Q. Did she give you any reason why she or Leonard Laws' family might be upset with him and why they wouldn't want to testify?

A. *She stated that she didn't wish to help Leonard in this case, and she didn't—she knew that the other family members didn't wish to help.* I believe I spoke with one of his brothers, too. I

am not sure of that. I just saw that that was amended today, and I didn't have an opportunity to look over my records. But I believe I spoke with one of his brothers.

(Emphasis added.)

Q. But in any case, you made some efforts, but you couldn't get any of them to testify?

A. *In the death phase, they were most adamant about not testifying.*

(Emphasis added.)

Q. But you pursued that as being a possible advantage to have?

A. In any death case, you wish to have someone, a relative to testify, to show that he has people who care enough to come in and testify.

[Rule 27.26 Tr. at 77–78.]

The Rule 27.26 court found as fact that trial counsel "contacted relatives of [Laws] by calling a phone number [Laws] supplied. Two different persons told [trial counsel] that the relatives would not testify on Leonard Laws's behalf." The court concluded that there was no deficiency on this ground, and the Missouri Court of Appeals agreed:

After multiple attempts to obtain relatives to testify for movant at the penalty hearing [counsel] was able to contact a woman he believed to be movant's stepmother and a brother. Both persons stated unequivocally that they would not testify at the penalty hearing and that other relatives would also not testify. [Laws] himself testified that he personally wrote his brothers and father requesting them to testify on his behalf, but they failed to appear for trial. Furthermore, [Laws] did not present family members as witnesses at the evidentiary hearing. Under the circumstances, we find that counsel engaged in an adequate investigation of movant's relatives, and that no favorable information appeared as a result. * * * Counsel was well aware of the helpfulness of favorable testimony by relatives during the penalty stage, as the record discloses, but unfortunately was faced with a situation where reasonable efforts revealed that

movant's relatives were strongly opposed to testifying. The decision not to call them as witnesses was thus a matter of trial strategy.

*Laws,* 708 S.W.2d at 187.

Again, we find the state courts' conclusions compelling. The district court, however, concluded that the record did not "reflect a responsible effort to glean available relatives' own knowledge of and relationship to petitioner." Mem.Op. at 22. We disagree with the district court's conclusion. We think that counsel's efforts in this regard were objectively reasonable.

Trial counsel could have reasonably determined that calling Laws' relatives to the stand, after what they had told him of their feelings for Laws, would have been destructive to Laws' defense. In view of the relatives' adamant refusal to testify favorably on Laws' behalf, cross-examination would not even have been necessary in order to hurt Laws' case. The simplest questions asked on direct examination would have revealed the relatives' total lack of any support for Laws. As a result, the jury more likely than not would have developed animosity toward Laws and would have distrusted and disrespected counsel's efforts. Counsel's decisions were within the wide range of professionally competent assistance required by *Strickland.*

### 3. Failure to Elicit Testimony of Community Members.

 Laws argues that his trial counsel was derelict in failing to call to the stand, or consider calling to the stand, a clergyman, statistician or professor to testify against the death penalty. The State first responds that this claim of error is subject to an adequate and independent state procedural bar precluding review by this court, because Laws failed to present this claim on appeal in the state courts. Laws presented the claim in his amended Rule 27.26 motion, but the Missouri trial court held it to be without merit. Laws, however, in appealing from the denial of Rule 27.26 relief, did not brief this allegation of error as a ground for appeal. We nonetheless conclude that this claim is properly before us for the following reasons. Laws filed a pleading with the Missouri Court of Appeals entitled "Appellant's Issues Expected To Be Raised On Appeal," which stated that "The trial court erred in failing to grant appellant's 27.26 motion for failure to investigate and prepare defense witnesses for the penalty stage." Laws argues, and we accept, that trial counsel's failure to elicit testimony from a clergyman, statistician or scholar was included in this general assignment of error. This pleading provided notice to the court of appeals that Laws sought review of this particular point. Furthermore, the court of appeals reviewed the findings of fact and conclusions of law with regard to this point in accordance with Missouri Supreme Court Rule 27.26(j). The court stated in relevant part:

On appeal, movant raises two points of error. First, movant contends that the trial court failed to make specific findings of fact and conclusions of law regarding his claim of ineffective assistance of counsel based on defense counsel's decision to refrain from putting on evidence during the penalty stage in mitigation of the death penalty.

\* \* \* \* \* \*

Movant presented the testimony of several witnesses, including his trial counsel, concerning the advisability of putting relatives and clergymen on the stand during the penalty stage of a capital murder trial to testify in mitigation of the death penalty. This testimony was received without objection by the state. *Under the circumstances, we find that the issue was tried by the implied consent of the parties, and thus, will be treated as amending the Rule 27.26 motion to conform to the evidence.*

*Laws v. State,* 708 S.W.2d at 184. (Emphasis added.)

Therefore, Laws did not waive his right to raise the failure of trial counsel to elicit testimony from a clergyman, statistician or professor in support of his ineffective assistance of counsel claim. In addition, the issue has been exhausted at the state level. "The exhaustion doctrine requires only that the state courts have one full and fair opportunity to decide a question which is

properly presented to it." *Mucie v. Missouri State Department of Corrections,* 543 F.2d 633, 636 (8th Cir.1976), citing *Picard v. Connor,* 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). Since the Missouri Court of Appeals ruled adversely to Laws on this point and the Missouri Supreme Court denied a motion for rehearing and/or transfer, Laws' state remedies as to this point have been exhausted, and it is properly before this court.

■ At the Rule 27.26 hearing, the following colloquy occurred as to this issue:

Q. Did you ever consider putting on any type of priest or some religious personage to testify?

A. Yes, I considered that. We had used that, two individuals of that ilk in the first trial [for the murder of Woodrow Wilson Elliott] to testify in the death phase.

Q. And what about the second trial? Why was that not—did that not come to pass?

A. After the first trial I spoke with the jurors in the case. And they told me that they had disregarded totally the testimony of these individuals. I believe the gentleman's name is Mr. Gilsonin.

Q. He was a statistician, or professor?

A. And I don't recall the other. I don't recall the other gentleman's name right now.

Q. But the one was a priest and one was a statistician?

A. Right. And the jurors said that they rejected out of hand that testimony and instead centered on the deal between Norman Gilmore and the State in their finding of fifty years rather than death in the first case.

Q. And so that influenced you as far as your trial strategy in the second case?

A. It did. And the fact that the facts in the second case were much different than the facts in the first case.

Q. You mean as far as who the actual killer was?

A. Right.

[Rule 27.26 Tr. at 78–79.]

In considering this testimony, the Rule 27.26 court made the following factual findings:

[Trial counsel] was fully informed at the time of trial of the possibility of calling clergy persons and professors to give their views on the death penalty. [Counsel] decided after due consideration and after calling such persons in the first trial of Leonard Laws that their testimony would not be beneficial to the case.

The court concluded in this regard: "Failure to call witnesses * * * was an appropriate trial strategy."

The district court noted that this issue was not as significant as the others, in part because the district court recognized that counsel had used two "community members" at Laws' prior criminal trial and thus had the opportunity to weigh their credibility and presentation in deciding whether or not to use them again. The district court also noted that the Missouri Supreme Court had recently found such testimony irrelevant. *State v. Gilmore,* 681 S.W.2d 934, 941 (Mo. banc 1984). The district court concluded, however, that "a discussion with one of twelve jurors as to why the jury reached its decision seems an insufficient basis for a tactical decision in a trial before a different jury—particularly where the consequence of the decision may be fatal." Mem.Op. at 23 n. 2.

We note that the record reflects that counsel spoke with more than one of the prior jurors. In any event, we believe that talking to jurors regarding the success of a strategy suggests not deficient representation but keen lawyering. Trial counsel was far better able to evaluate the potential impact of community member testimony after having seen how successful it had been than if he had made the decision to use or reject such testimony in a vacuum.

Counsel's choice was solidly grounded in practical concerns and experience. A trial lawyer does not try each new case with his mind a blank slate; rather, he brings to the case the sum of his knowledge and experience gained through previous trials. This is what distinguishes the veteran litigator from the recent law school graduate. Laws' trial counsel had previously defended Laws for the Elliott murder, *see supra* notes 1 and 12, and he took the opportunity

to find out what had worked and what had not. He was told directly that the jurors had put no credence in the testimony of community members. Relying on this information and his practical experience in the previous case, counsel made the reasonable decision not to present what he considered to be useless testimony in this case.[13]

Accordingly, we hold that trial counsel's choice not to present the testimony of community members was an intelligent, tactically sound piece of trial strategy. Laws' claim on this ground thus fails the first *Strickland* prong, which requires that counsel's performance be shown deficient.

## V. CONCLUSION.

In examining counsel's performance, we do not use 20–20 hindsight. As this court stated in *Blackmon v. White*, 825 F.2d 1263 (8th Cir.1987):

[T]he courts must resist the temptation to second-guess a lawyer's trial strategy; *the lawyer makes choices based on* the law as it appears at the time, the facts as disclosed in the proceedings to that point, and *his best judgment as to the attitudes and sympathies of judge and jury.* The fact that the choice made later proves to have been unsound does not require a finding of ineffectiveness. The petitioner bears the burden of successfully challenging particular acts and omissions of his attorney which were not the result of reasonable professional judgment; *it is not enough to complain after the fact that he lost, when in fact the strategy at trial may have been reasonable in the face of an unfavorable case.*

*Blackmon,* 825 F.2d at 1265 (Emphasis added.)

We believe that counsel's strategy was indeed reasonable in the face of this highly unfavorable case. Accordingly, Laws has

failed to show that his trial counsel's performance deprived him of his sixth amendment right to effective assistance of counsel.

For the foregoing reasons, the judgment of the district court is reversed.

McMILLIAN, dissenting.

I respectfully dissent. I would affirm the district court's judgment granting the writ of habeas corpus because appellant did not receive effective assistance of counsel at the penalty phase of his trial. *Laws v. Armontrout,* No. 86–2214C(3) (E.D.Mo. Dec. 15, 1986) (Memorandum Opinion). Consequently, I would remand the case to the state court for a new trial on the penalty phase only.

This is a death penalty case wherein defense counsel failed to conduct a reasonable investigation into appellant's background and to present mitigating evidence in the bifurcated penalty stage of appellant's trial. An experienced district court judge, after an extended hearing, found that counsel's representation fell far below the standard of reasonableness and prejudiced appellant. Specifically, the court found that counsel (1) failed to investigate and present evidence about appellant's military background and the effect his service in Viet–Nam had on him, (2) failed to make reasonable efforts to contact appellant's family members and to present evidence from them, (3) failed to investigate and present evidence of appellant's prior psychological evaluations, and (4) failed to present any evidence as to the inappropriateness of the death penalty. On the basis of these findings, the district court concluded, and I agree, that there was a reasonable probability that, but for counsel's ineffective representation, the result of the proceedings could have been different.

I agree that the right to counsel is limited to the right of effective assistance of

---

**13.** Counsel had pursued substantially the same strategy during the punishment phase of the *Elliott* trial as he used here. In the *Elliott* trial, the strategy was successful, because Laws received a life sentence rather than the death penalty. Laws had no complaint with counsel's strategy at the *Elliott* trial. Counsel then used the essential ingredients of his previously successful strategy in this trial, while refining the strategy to omit the testimony of community members based on the lessons learned from the prior trial. In short, for counsel to repeat a winning strategy in a later trial for the same type of crime, involving the same defendant, strikes us as eminently reasonable.

counsel, and by no means does it mean the right to acquittal. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 2d 674 (1984) (*Strickland*). In *Strickland*, the Supreme Court articulated the following standard in determining the issue of ineffective assistance of counsel:

> The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.

*Id.* at 686, 104 S.Ct. at 2064. This benchmark has two components, the breach of duty by trial counsel and prejudice resulting therefrom. To establish the breach, counsel's errors must be so serious and of such a magnitude as to be in violation of the sixth amendment guarantee to counsel. In this area we do not deal in absolutes, the test is one of reasonableness i.e., "the skill and diligence that a reasonably competent attorney would exercise under similar circumstances...." *Kellogg v. Scurr*, 741 F.2d 1099, 1100 (8th Cir.1984); *citing Thomas v. Lockhart*, 738 F.2d 304, 307 (8th Cir.1984). Not only are we counseled to be deferential to trial counsel's decisions, but we must also afford those decisions a strong presumption of correctness. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064.

Where the defendant's life may be the penalty exacted by the state, I do not believe we ask too much of trial counsel that he or she make a reasonable investigation so that he or she can make and put before the court the best defense available to the defendant. The *Strickland* court specifically recognized the duty of a defense attorney to investigate:

> [C]ounsel has a duty to make reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for *reasonableness* in all the circumstances....

466 U.S. at 691, 104 S.Ct. at 2066 (emphasis added). The Supreme Court, in taking counsel to task for inadequate preparation, said:

> [A] complete lack of pretrial preparation puts at risk both defendant's right to an "ample opportunity to meet the case of the prosecution" ... and the reliability of the adversarial testing process.

*Kimmelman v. Morrison*, 477 U.S. 365, 106 S.Ct. 2574, 2589, 91 L.Ed.2d 305 (1986) (citations omitted).

Applying the standards and holding of *Strickland* and *Kimmelman* to the present case, it is obvious that appellant received ineffective assistance of counsel and was prejudiced thereby. The duty to advocate the defendant's cause, including consulting with defendant and bringing to bear such knowledge as will render the trial a reasonable adversarial process, *Strickland*, 466 U.S. at 668, 104 S.Ct. at 2052, mandates the trial counsel investigate and develop facts about the defendant's background in an attempt to develop evidence to mitigate. Once counsel has completed such an investigation, then, and only then, woulud he or she be in a position to make a reasonable strategic decision whether or not to present the evidence.

In the present case, trial counsel had a telephone conversation with someone claiming to be appellant's stepmother; this person indicated that none of appellant's relatives wished to testify for appellant. Consequently, counsel failed to contact or meet with other relatives to discuss appellant's background and thus failed to gather information concerning appellant's Viet–Nam war experience and his post Viet–Nam personality change.

The majority relies primarily on the presumption of correctness to be accorded a state court's finding of fact as the basis for its decision. While I do not dispute this proposition as a general legal proposition, the presumption of correctness does not apply to the state court's determination of the effectiveness of counsel. In *Sumner v. Mata*, 455 U.S. 591, 597, 102 S.Ct. 1303, 1306, 71 L.Ed.2d 480 (1982), the Supreme Court held that the presumption of correctness accorded the factual findings of the state court under 28 U.S.C. § 2254(d) applies only to historical facts underlying counsel's performance but not to the ultimate conclusion whether effective assist-

ance has been rendered. This latter conclusion is not a finding of fact binding on a federal court because effective assistance is a mixed question of law and fact. *Thomas v. Lockhart,* 738 F.2d at 307.

Thus, the district court had the duty to carefully examine the conclusion of the state court and to make "every effort ... to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct and to evaluate the conduct from counsel's perspective at the time." *Thomas v. Lockhart,* 738 F.2d at 309; *see Kellogg v. Scurr,* 741 F.2d at 1101. Counsel may not immunize his or her performance from sixth amendment scrutiny by labeling acts or omissions as trial strategy. *Kellogg v. Scurr,* 741 F.2d at 1102.

I do not take issue with the state court's determination of historical facts. I accept for purposes of this analysis that trial counsel did the acts he testified to: he reviewed the 1981 psychiatric examination but did not consider the 1974 psychiatric examination and did not speak to the psychiatrist to determine the significance of appellant's diagnosis, he spoke to a woman he believed to be appellant's stepmother and may have spoken to appellant's brother but couldn't remember their names, and he talked to one (or perhaps two) jurors to determine whether the testimony of community persons in behalf of appellant was effective.

It is these facts admitted by counsel (and accepted by the state court) that the district court subjected to an independent evaluation to determine if there was effective assistance of counsel. It is this independent evaluation which the majority wrongly rejected. The majority incorrectly applies the presumption of correctness not only to the historical facts found by the state court, but also to the state court's conclusion that effective assistance was provided. *See Sumner v. Mata,* 455 U.S. at 597, 102 S.Ct. at 1306. *Kellogg v. Scurr,* 741 F.2d at 1102.

Granted, trial counsel put much store in his belief that the jury would never impose the death penalty because appellant was not the person who fired the gun and,

therefore, did not deserve to die. Such a belief was totally unwarranted, considering the gruesome and calculated nature of the murders with which appellant was charged and his prior capital murder convictions. To disregard the reality and seriousness of the situation was unreasonable and contrary to professional norms. It also evidenced a complete lack of pretrial preparation and put at risk appellant's right to offer evidence of mitigating circumstances and undermines the reliability of the adversarial process. *See Kimmelman,* 106 S.Ct. at 2589.

The district court, in the present case, did not set the conviction aside; the court only ordered that the case be remanded for a new hearing on the penalty. Thus, appellant will not go free because trial counsel blundered. The only effect thus would be to grant appellant a new penalty hearing, which will be in accord with our notion of fair treatment before one's life can be forfeited. I would affirm the district court.